Filed 5/4/16

CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C076324 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 11F4087, 12F9012, 13F1002, 13F6477) |
| v. | |
| JOHN PATRICK FRUITS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Shasta County, Daniel E. Flynn, Judge.  Affirmed as modified.

Hassan Gorguinpour, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Julie A. Hokans, Supervising Deputy Attorney General, Galen N. Farris, Deputy Attorney General, for Plaintiff and Respondent.

---

<sup>*</sup>  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I.B.4. and II.

1

In this case, we discuss the admissibility of evidence under Evidence Code sections 1109, 1101, subdivision (b), and 352 in an elder abuse prosecution. Defendant John Patrick Fruits threatened his 73-year-old mother and swung long-handled pruning shears at her, missing her neck by a matter of inches. When he returned to her home the following day, he threatened to kill his mother because she had called the police.

A jury found defendant guilty of elder abuse (Pen. Code, § 368, subd. (b)(1) (count one)),[1] assault with a deadly weapon (§ 245, subd. (a)(1)) (count two)), making criminal threats (§ 422 (count three)), exhibiting a deadly weapon (§ 417, subd. (a)(1) (count four)), and attempting to dissuade a victim or witness (§ 136.1, subd. (b)(2) (count five)). The trial court also found true enhancements for defendant having served a prior prison term (§ 667.5, subd. (b)), and that defendant committed count one while on bail or while released on his own recognizance in connection with other cases (§ 12022.1). Combined with three other cases, defendant was ultimately sentenced to an aggregate term of 8 years 4 months.

On appeal, in connection with count three, charging him with making criminal threats (§ 422), defendant asserts that the trial court abused its discretion in admitting testimony concerning alleged prior threats against his mother to prove the less specific current threats charged in this case. He also asserts that the trial court made a series of errors in imposing restitution and parole revocation fines.

In the published portion of this opinion, we conclude that the trial court did not abuse its discretion in admitting the evidence of prior threats and other misconduct. Defendant asserted that the trial court misunderstood how he planned to deal with the evidence of prior threats in trial and based its Evidence Code section 352 balancing analysis on this erroneous understanding. We conclude that defendant forfeited any

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

2

claim related to the trial court's balancing analysis, because defendant did not inform the court how the defense planned to handle the prior threat evidence so that the court could factor that into the Evidence Code section 352 analysis. We further conclude that the prior threats evidence was relevant and highly probative of (1) defendant's propensity to abuse elders, (2) his intent to threaten the victim and place her in fear, (3) whether the victim was placed in sustained fear, (4) whether the victim's fear was reasonable, and (5) defendant's motive for abusing, assaulting, and threatening the victim. We also conclude that the fact the prior acts did not result in a conviction added weight on the probative value side of the Evidence Code section 352 scale here, not on the prejudicial side. This is so because the fact that the prior acts were not prosecuted reflected the victim's fear of defendant, which was probative on the issue of the victim's trial credibility and the fear elements of the criminal threat count.

In the unpublished portion of this case, we conclude that defendant has forfeited a number of his contentions with regard to restitution and parole revocation fines. However, we agree with defendant that the trial court erred in imposing a restitution fine and parole revocation fine related to a stayed sentence. Finally, we conclude that the trial court erred in failing to impose sentences on two felony counts, and then stay execution of those sentences pursuant to section 654.

We modify the judgment to: (1) decrease the restitution fine and parole revocation fine by $280; (2) impose a sentence of four years plus a one-year enhancement on count two and stay execution of that sentence pursuant to section 654; and (3) impose and stay execution of a sentence of one year on count four pursuant to section 654. We also require correction of the abstract as discussed *post*. As so modified, we affirm.

3

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### The Charges

On January 7, 2014, the Shasta County District Attorney filed a consolidated information, charging defendant with elder or dependent adult abuse (§ 368, subd. (b)(1) (count one)), assault with a deadly weapon (§ 245, subd. (a)(1) (count two)), making criminal threats (§ 422 (count three)), exhibiting a deadly weapon (§ 417, subd. (a)(1) (count four)), attempting to dissuade a victim or witness (§ 136.1, subd. (b)(2) (count five)), and contempt of court -- disobeying a court order (§ 166, subd. (a)(4) (counts six-eight)). The information further alleged as to counts one, two, three, and five, that defendant had served a prior prison term within the meaning of section 667.5, subdivision (b), and that he committed counts one through three while on bail or while released on his own recognizance in connection with other cases within the meaning of section 12022.1.

### The People's Case-in-Chief

Defendant's brother David Fruits[3] testified that, on October 4, 2013, he got into an argument with defendant. David's son, Davis, was present, as was Jennifer Karlowsky, whom David was dating. David had been in the free-standing cabin or studio or "granny unit" on his parents' property where he was living when he saw defendant approaching. David told Karlowsky to stay in the studio with Davis and to lock the door while he went outside. David spoke with defendant and they began to argue. The incident did not become physical, however. After the brothers argued for two to three minutes, David

---

[2] Defendant was sentenced following convictions in several different cases. Because defendant's evidentiary contention relates only to case number 13F6477, the elder abuse case, we set forth facts relevant to that case here and discuss facts related to the sentencing issues, *post*.

[3] Because several witnesses share the same surname with defendant, for clarity and conciseness, we refer to these witnesses by their first names.

walked away because he did not want the confrontation to escalate. He went into his parents' main house and locked the door. Defendant got on his bike and began to leave when their mother, Bonnie, age 73, pulled up in her car.

David exited the house and told Bonnie about the argument. Bonnie testified that David told her he had been talking with defendant, who was upset, and David locked the house fearing that defendant wanted to come in. Bonnie grew worried because David's back was injured, and she feared that if he fought with defendant, he would not be able to defend himself. She went to talk to defendant.

As David watched, defendant and Bonnie grew upset with each other and argued loudly. Bonnie told defendant that it was time to leave, but defendant refused. Bonnie testified that defendant picked up some pruning shears that were on a nearby wheelbarrow and "moved them towards [her]." The shears came within inches of Bonnie's head and shoulders. David testified that he did not see defendant holding pruning shears, although he had gone to the bathroom during a portion of the argument between Bonnie and defendant. Defendant left on his bike. Bonnie testified that after defendant left, it occurred to her that perhaps defendant had been attempting to harm her. However, Bonnie also testified that she had not seen exactly what defendant had done with the pruning shears because she only saw a flash of metal in her peripheral vision. When asked whether it was true that, when he did this, defendant was threatening to kill her, Bonnie responded that she could not remember what he said. Bonnie did testify that defendant's voice was loud and he was "being on the threatening side."

After the incident, Bonnie called the police. In the 911 call, which was played for the jury, Bonnie reported, "[M]y son, he threatened my life." She stated that defendant "picked up some . . . big loppers and he swung it at [her] and stopped about three inches from [her] neck." She further described the tool that defendant swung at her as "long handled pruning shears." She reported, "He is out of his mind right now," and added, "I am afraid."

5

Corporal Mike Woods responded to the house and spoke with Bonnie. Bonnie reported to Woods that she had an altercation with defendant. According to Woods, Bonnie described the incident as follows: "during an argument . . . between David and [defendant], . . . they became physical with each other and that [defendant] had chased David about the property and that she had tried to stop the incident and that at that point he . . . became angry with her. Somehow he was associated with a bicycle on the property. He threw the bicycle down, and he charged at her and . . . picked up a pair of pruning shears that were laying on a table nearby . . . ." Defendant then swung the pruning shears at Bonnie's neck. The shears came within a couple of inches of her neck. Bonnie reported to Woods that defendant had stated during the incident that "he was going to get her and possibly kill her." Bonnie told Woods she had been frightened that defendant was going to kill her, and expressed fear that he would follow through with his threats. She asked Woods what she could do. Woods explained to her the process of obtaining a restraining order.

Woods testified he and other officers "made a pretty extensive area check" for defendant. However, they were unable to locate him.

Defendant returned to the house the next day. Because police had told Bonnie to call if defendant returned, she contacted the police. Woods returned to the house. Bonnie met Woods in the driveway and informed him that defendant had returned to the property and was creating a disturbance. She specifically stated that defendant was angry that she had called the police and had threatened to kill her for doing so. Woods located defendant in one of the sheds or outbuildings on the property and arrested him. After being read his *Miranda*[4] rights, defendant agreed to speak with police. He told police

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

6

that he had argued with Bonnie the previous day, but denied threatening to kill her or swinging pruning shears at her.

John, defendant's father, testified that he had visited defendant in jail on two or three occasions after his arrest. John acknowledged that defendant asked him to pass messages to Bonnie about what happened during their confrontation. John testified that he spoke with Bonnie "a little bit" about how she would testify in court, but he did not talk to her about the messages defendant wanted him to convey. When asked if he ever told Bonnie that she should say that nothing happened, John responded, "Maybe once but I doubt it." He testified that he never told Bonnie to say she could not recall what happened. Recordings of jailhouse calls between defendant and John, which took place on four separate days in October 2013 were played for the jury.

Bonnie testified that John had told her she should say that nothing had happened. Her daughter Brenda had also been telling her to change her story to help defendant. Bonnie acknowledged telling the prosecutor's investigator, approximately one month prior to trial, that she was feeling pressured by her family to change her story.

Bonnie also acknowledged writing a letter to the prosecutor's office in which she stated that defendant had a drug problem, expressed fear that an incident like the one at issue could happen again, and requested a stay-away order. However, she also testified that defendant "gets mad, but he doesn't do anything." On cross-examination, Bonnie testified that she had sought the no-contact order, in part, because she was afraid defendant would harm her.

Bonnie testified that defendant never hurt her in the past, but in 2013, he pushed her out of an apartment and she hurt her heel trying to resist. She called the police to report the incident, but after the police arrived, she told them she did not want to press charges. Bonnie testified that she did not remember whether defendant had ever threatened her before. When the prosecutor asked Bonnie whether defendant had previously threatened to slit her throat, she testified that she did not remember such an

7

incident occurring. She also denied that defendant ever told her that he would "fix" her, which she understood to mean he would hurt her. Bonnie flatly denied telling district attorney investigator Diana Hawkins that defendant made those threats. She did testify that defendant "would be belligerent" when he visited the house. When asked again whether defendant had threatened to slit her throat, she responded, "No, not . . . quite like that." She then admitted defendant had threatened to harm her in the past. Also in the past, defendant pulled her down a set of stairs as she attempted to resist by holding on to the stairs. When asked whether she wanted to talk about the other things defendant had done to her, Bonnie responded, "Well, I don't care to talk about them."

According to Corporal Woods, Bonnie told him that there had been several incidents between her and defendant in the past. Bonnie told Woods that defendant had threatened and battered her.

Hawkins participated in a phone conversation with Bonnie by speakerphone on October 21, 2013. Bonnie stated that John and her daughter Brenda were attempting to persuade her to change her testimony. They wanted her to testify that certain things did not happen, or that they did not happen in the manner she previously reported. Bonnie feared her family would be upset with her if she did not change her story. According to Hawkins, Bonnie stated that, if she did not change her testimony, John would separate from her. Bonnie also stated that she did not want her family in court when she testified at a preliminary hearing because they would be upset with her.

During the telephone conversation with Hawkins, Bonnie also discussed prior instances when defendant had been violent towards her. He had previously threatened her with a knife, pushed her, threatened to slit her throat, and stated that he would "fix her." Bonnie explained that she interpreted defendant's threat to "fix her" as threatening some sort of harm.

In performing a follow-up investigation, Hawkins went to Bonnie's house and spoke with her. Bonnie stated that she wanted to keep in place a restraining order she had

8

obtained, because she was not sure whether defendant was trying to harm her or merely get her attention. Hawkins's colleague asked Bonnie why she felt she needed a restraining order if defendant was not trying to harm her. Bonnie, who appeared off guard and unsure how to answer the question, responded by saying, "You ask some good questions."

The parties stipulated that, in a prior 911 call on April 8, 2013, Bonnie stated among other things: " 'And I'm tired of him [¶] . . . [¶] . . . pushing me around,' " " 'He's gonna come back and try to kill me or something for calling,' " and that she was not in any immediate danger " 'unless they come back.' " When asked if she needed medical attention, she said she did not, but then added, " 'I'll probably have bruises on my back and arms.' " At the time this stipulation was read to the jury, the court instructed the jury that these statements were introduced for purposes of impeachment as prior inconsistent statements made by Bonnie, and they were not to be considered for any other purpose, but the court also explained it would read further instructions "on how they pertain to these issues."[5]

### Defendant's Case

Defendant testified on his own behalf. He testified that on October 4, 2013, he was at his parents' house doing laundry. Defendant saw David, said hello, and David returned to his cabin. Defendant also spoke with Jennifer Karlowsky. David grew angry that defendant was talking to Karlowsky and he became gruff with defendant. David

---

[5] Instructing from CALCRIM No. 226 at the end of the trial, the trial court explained that among the factors a jury could consider in deciding the credibility of witnesses are: "Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony," and "If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject." Instructing from CALCRIM No. 318, the court also told the jurors they could use prior inconsistent statements to evaluate witness credibility and also as evidence that what was said on the former occasion was true.

9

then claimed that defendant owed him money, and that defendant had "ripped him off . . . ." Defendant approached David to talk about the matter. David retreated to the main house. Defendant went to visit with a friend and then returned to the laundry room to change out his laundry. Karlowsky approached him and told him that it would be good if he left.

As defendant prepared to leave, Bonnie drove up to the house. Defendant and Bonnie talked for a minute, and Bonnie yelled at defendant. She asked him what he was doing and said he was not wanted there. She continued to berate defendant until he left on his bicycle. Defendant testified that he did not pick up pruning shears, and he never swung pruning shears at Bonnie. In fact, he could not swing shears because he had a bad shoulder and he could not lift his arm very high. He never saw anyone that day with pruning shears. Defendant also testified that he never threatened to kill or harm Bonnie.

Jennifer Marie Karlowsky testified that as of October 4, 2013, she was homeless and was moving her possessions to the Fruits's residence. Karlowsky saw defendant doing laundry and later saw him doing yard work for his parents. She briefly spoke with defendant, and it appeared to anger David that she did so.

At one point, David began to "lay[] into [defendant]" and treat him very rudely. David was "trying to make conversation though not in a loving way." Defendant continued to try to do what he was doing.

Later, defendant began to leave the property. David was following defendant, holding trimming shears. David then went into the house. Bonnie arrived as defendant was leaving with his bicycle. Bonnie began to speak rudely to defendant, saying that he was not welcome and that nobody liked him. Defendant continued to try to leave the property. David emerged from the house, holding the pruning shears. Karlowsky walked to the cabin and when she turned around, she saw David talking to Bonnie and defendant was gone.

10

Karlowsky never saw defendant swing pruning shears at Bonnie. She also never heard defendant threaten Bonnie.

Defendant testified that on October 5, 2013, he again went to his parents' house, this time to visit John. Bonnie again began to yell at defendant, telling him that he was not welcome and to get out. Defendant stated that he was there to visit John, and he walked down a hallway to the bedroom. Bonnie called 911. Defendant stayed and talked to John for five to ten minutes. Defendant went to visit a friend. Within 10 or 15 minutes, police arrived where defendant was visiting his friend and arrested him.

**The People's Rebuttal Case**

In rebuttal, the prosecutor called Anthony Rose, an employee of WinCo grocery store. Rose testified that on August 27, 2011, defendant could be seen on the store's video camera system. Rose identified defendant in the video recording and in several still photographs from the system. In the photographs, defendant could be seen lifting items from a shelf and placing them in a cart.

The prosecutor also recalled Bonnie. She testified that she went to the prosecutor's office a couple of days after she testified in the trial and met with the prosecutor and Hawkins. Bonnie wanted to discuss a letter she wrote at John's urging. John told Bonnie what to write in the letter. She also testified that she did not want John to know that she had gone to the prosecutor's office. When asked whether she was concerned of being labeled a "rat," Bonnie testified, "I feel kind of trapped. I -- I come in and talk to you, and then you turn things against me, and I don't -- I -- I just feel trapped when you do that."

The prosecutor also recalled Hawkins. She testified that she was present when the prosecutor met with Bonnie following her initial testimony. According to Hawkins, during that meeting, Bonnie stated that she had difficulty sleeping at times when she had argued with defendant because she worried that defendant would come in and harm her. Hawkins also testified that, during that meeting, when Bonnie learned that her visit to the

11

prosecutor's office would be discussed in court, she seemed frightened and desperate for that information not to surface. She indicated that she was fearful of being labeled a rat.

## Defendant's Surrebuttal Case

Defendant testified that he never went into Bonnie's house or into her bedroom to harm or threaten her. Defendant also testified that Bonnie had always had problems sleeping. Defendant testified that he had experienced greater problems with his shoulder since August 27, 2011, the date he was recorded on video shopping in the WinCo store. He had been in a car accident and "injured [his] shoulder even worse than what it was." He also had calcium deposits. He could not swing his arm upward over his head or downward with any force.

## Verdict and Sentencing

On January 15, 2014, the jury found defendant guilty of elder abuse (§ 368, subd. (b)(1)), assault with a deadly weapon (§ 245, subd. (a)(1)), making criminal threats (§ 422), exhibiting a deadly weapon (§ 417, subd. (a)(1)), and attempting to dissuade a victim or witness (§ 136.1, subd. (b)(2)). With the jury deadlocked on counts six through eight, charging defendant with contempt of court -- disobeying a court order (§ 166, subd. (a)(4)), the court declared a mistrial as to those counts. The trial court thereafter granted the prosecutor's motion to dismiss those counts. Following the release of the jury, the trial court found the prior prison term enhancement (§ 667.5, subd. (b)) and the section 12022.1 enhancement alleged in connection with count one to be true. The court deferred ruling on the remaining section 12022.1 enhancement allegations. Ultimately, the trial court sentenced defendant to a total of eight years four months on this case and three others.

## DISCUSSION

### I.  Evidence of Prior Threats and Violent Acts

### A.  Additional Background and Defendant's Contentions

Prior to trial, the prosecutor filed in limine motions, seeking, inter alia, the admission of prior acts of elder abuse committed by defendant against Bonnie.  The prosecutor asserted that any prior acts of elder abuse were admissible to show propensity pursuant to Evidence Code section 1109, subdivision (a)(2).  Additionally, the prosecutor asserted that the prior acts were admissible pursuant to Evidence Code section 1101, subdivision (b), because they were relevant to show that defendant had a motive to commit the charged crimes, that he had a particular intent to commit the charged crimes, and because they demonstrated the absence of any mistake.  The prosecutor also contended that the prior acts were relevant to explain the reasonableness of the victim's fear.

The prosecutor's offer of proof was based on several "log" reports related to calls for service between 2007 and 2013, in which Bonnie reported that defendant made threats or committed acts of violence.  In 2007, she reported that defendant threatened to burn down the house and harm her.  In 2011, she reported that defendant was "yelling at her and in her face."  In 2013, she reported that defendant battered her, although she declined to press charges.  Later in 2013, she reported that defendant was threatening to kill the family and to set their cars on fire.  The prosecutor also anticipated the possibility that Bonnie would testify to additional threats or acts which had not been reported and which she had not yet disclosed.

In discussing the prosecutor's in limine motions, the court opined that the evidence the prosecutor sought to introduce appeared to be highly relevant.  Defense counsel objected to the admission of the evidence as being more prejudicial than probative.  Defense counsel pointed out that there were no convictions related to the evidence at issue, and several of the alleged incidents were not reported to law

13

enforcement. Counsel argued that the only evidence supporting several of the alleged incidents consisted of unsubstantiated statements by the victim.

The court stated that the absence of convictions or reports supported the notion that the victim was reluctant to testify against her son. The court then stated: "In addition, I think that some of this stuff would be helpful because, [counsel for defendant], you're going to be claiming that . . . he's a bunch of hot air, and if there are earlier threats where nothing has happened, then you can establish that [defendant] may say things that are stupid but they're not criminal and he doesn't really intend to do anything; hence, we don't see any specifics in terms of past convictions or batteries. I don't know if there are any such batteries, but if he just talks or doesn't do anything, then that would potentially undermine Bonnie Fruits' attitude about whether or not she is in sustained fear. So, it kind of cuts both ways." Defense counsel did not deny the intent to make the argument the trial court predicted and offered nothing to the court about how the defense intended to address the prior elder abuse evidence.

The trial court granted the prosecutor's in limine motion to admit the evidence of the prior threats.[6] The court stated, "Anything that would affect her . . . mental state and place her in fear or sustained fear would be admissible. So, even if she heard through some son of hers, other than [defendant], that [defendant] was making threats to her, that would also potentially influence her."

During his opening statement, defense counsel did not assert that defendant made hollow threats. Rather, he said the evidence would show that defendant did not make any threats to Bonnie at all. Defense counsel reprised this position in closing arguments.

---

[6] The trial court did not expressly rule on the evidence of the prior batteries, but defendant's entire focus on appeal is the prior threats and he asserts no error in admitting the evidence of the prior batteries. In any event, our analysis concerning the admissibility of the prior threats has equal application to the admissibility of the prior batteries.

14

On appeal, defendant contends that the trial court erred in admitting evidence of prior threats he made against Bonnie to prove his guilt of making criminal threats. (§ 422.) Defendant asserts that, because the trial court misunderstood the defense position in opposing the admission of alleged prior threats, it erred in its balancing, pursuant to Evidence Code section 352, of the probative value of this evidence against its prejudicial effect. Specifically, defendant asserts that, contrary to the court's understanding, the defense did not intend to argue that defendant previously had made threats but that they were hollow threats as he was "a bunch of hot air . . ." and that defendant "may say things that are stupid but they're not criminal and he doesn't really intend to do anything . . . ." Rather, the defense position was that defendant never made the prior threats as alleged. Thus, according to defendant, the trial court's Evidence Code section 352 balancing was based on an erroneous assumption about the defense theory. The probative value of the prior acts evidence did not " 'cut both ways' " as the trial court had reasoned; rather it "cut only one way" and that was against defendant. Furthermore, because the court misunderstood defendant's position in this regard and assumed that defendant was essentially admitting to prior threats but asserting that they were meaningless, it could not fully consider the prejudicial impact of the evidence. Thus, defendant asserts that, in undertaking its Evidence Code section 352 balancing analysis, the court made its determination upon a factual belief not supported by substantial evidence, and therefore it abused its discretion in ruling the evidence admissible. Defendant also asserts that the evidence of the prior threats was more inflammatory than the charged conduct. Additionally, he asserts that, because the prior alleged threats did not result in convictions, the jury could have been motivated to punish him for his prior unpunished acts, regardless of his guilt of the charged offenses. Defendant asserts that the error in admitting this evidence violated his federal due process rights because he has the right to be judged for what he did, not who he is.

We conclude that the trial court did not abuse its discretion in granting the People's in limine motion to admit evidence of prior threats against Bonnie.

## B. Analysis

### 1. Evidence Code sections 1101, 1109, and 352

Evidence Code section 1101, subdivision (a), provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

With exceptions not applicable here, Evidence Code section 1109, subdivision (a)(2), provides: "[I]n a criminal action in which the defendant is accused of an offense involving abuse of an elder or dependent person, evidence of the defendant's commission of other abuse of an elder[7] or dependent person is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Evidence Code section 352 serves as a safety valve for section 1109 that prohibits the admission of uncharged elder abuse evidence whenever its prejudicial impact substantially outweighs its probative value. (Cf. *People v. Johnson* (2010) 185 Cal.App.4th 520, 529 (*Johnson*) [prior acts of domestic violence held admissible under Evidence Code section 1109, subd. (a)(1)].)

---

[7] " 'Abuse of an elder' " includes physical abuse and "other treatment that results in physical harm, pain, or mental suffering." (Evid. Code, § 1109, subd. (d)(1).)

"Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168 (*Holford*).)

## 2. Relevance and Probative Value

Defendant grudgingly acknowledges that the evidence at issue here "might have been relevant and admissible under Evidence Code[] section 1109." Indeed, Evidence Code section 1109 is an express exception to the prohibition against propensity evidence set forth in Evidence Code section 1101, subdivision (a). (Evid. Code, §§ 1101, subd. (a), 1109; see *People v. Zavala* (2005) 130 Cal.App.4th 758, 770.) Evidence Code section 1109 allows a jury to draw propensity inferences from prior acts. (*Johnson, supra*, 185 Cal.App.4th at p. 529.) However, as clearly set forth in Evidence Code section 1109, the admissibility of such evidence also depends upon the balancing of the factors set forth in Evidence Code section 352 against the probative value of the evidence. Accordingly, we first discuss the probative value of the evidence in this case and then turn to the balancing analysis required under Evidence Code section 352.

In discussing the admissibility of evidence under the uncharged domestic violence evidence provision in subdivision (a)(1) of Evidence Code section 1109, it has been recognized that " ' "[t]he principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' [Citation.] Section 1109 was intended to make admissible a prior incident 'similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.' (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995-1996 Reg. Sess.) June 25, 1996, p. 5 (Assembly Analysis of Senate Bill 1876).) Thus, the statute reflects the legislative judgment that in domestic violence cases,

17

as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation. [Citation.] Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence. (Assem. Analysis of Sen. Bill 1876, *supra* at pp. 6-7; [citation].) This pattern suggests a psychological dynamic not necessarily involved in other types of crimes." (*Johnson, supra*, 185 Cal.App.4th at pp. 531-532, footnotes omitted.)

As originally enacted, section 1109 addressed only domestic violence prosecutions, such as was the case in *Johnson*. However, subdivision (a)(2) of section 1109, addressing criminal actions in which the defendant is accused of offenses involving abuse of an elder or dependent person, was added in 2000. (Stats. 2000, ch. 97, § 1.) As noted by the Senate Committee on Public Safety in considering the addition of elder abuse cases to the scope of Evidence Code section 1109: "Often times seniors are abused by close relatives. Many victims, out of fear of prosecuting an abusive relative, are uncooperative at trial. This makes it very difficult for prosecutors to substantiate abuse claims. Currently, this evidence is admissible in domestic violence and sexual offense cases. In many ways, the relationships and patterns in elder abuse situations are similar to those in domestic violence and sex offense cases. We need to provide the same protections to seniors in order to save lives and stop cycles of abuse." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2063 (1999-2000 Reg. Sess.) as amended June 5, 2000, p. 4.)

Here, defendant was charged with making criminal threats by threatening Bonnie's life while swinging pruning shears at her and missing her neck by mere inches. The evidence the prosecutor intended to elicit consisted of recent threats defendant made against Bonnie and other acts of violence. We conclude that this evidence was similar to the charged offense, and was thus highly probative as to whether defendant made criminal threats against Bonnie as charged here.

18

Moreover, as defendant would apparently have us ignore, the evidence was also highly probative of defendant's propensity to abuse elders and thus highly probative as to whether defendant committed all of the charged offenses, not just the criminal threats charge. Indeed, as we discuss in more detail *post*, the trial court instructed the jury that based on the prior acts of abuse, it could conclude from that evidence "that the defendant was likely to commit the crime of elder abuse, or crimes involving abuse of an elder." The instruction appropriately did not limit the use of the evidence at issue to proving the criminal threats charge.

Additionally, the evidence of prior threats was probative as to specific elements of the crime of making criminal threats and thus admissible under Evidence Code section 1101, subdivision (b).[8] Here, the contested evidence of defendant's prior threats against Bonnie was relevant to and probative of whether defendant intended to make a threat, whether the charged threat caused Bonnie to be in sustained fear for her safety, and whether such fear was reasonable. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 808 [the victim's knowledge of the defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear within the meaning of § 422]; *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1143 [evidence of a prior stalking conviction was

---

[8] "In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat--which may be 'made verbally, in writing, or by means of an electronic communication device'--was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

19

admissible under Evid. Code, § 1101, subd. (b), for the non-propensity purpose of proving the defendant's intent and the sustained nature of his victim's fear, both of which were elements of the charged criminal threats offense]; *People v. McCray* (1997) 58 Cal.App.4th 159, 172 (*McCray*) [evidence of past violence against the victim was relevant to the defendant's intention to cause the victim fear and to whether the victim was reasonably caused to be in fear for her safety based on the defendant's threats]; *People v. Garrett* (1994) 30 Cal.App.4th 962, 967 [evidence of prior conviction and of prior violence against the victim was relevant to the defendant's intent to make a threat, to whether the victim was placed in state of sustained fear, and to whether that fear was reasonable].)

Furthermore, prior threats and acts of violence against a victim are admissible under Evidence Code section 1101, subdivision (b), to establish motive in a prosecution involving violence or the threat of violence against the same victim. (*McCray, supra*, 58 Cal.App.4th at pp. 171-172; *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1610 [evidence tending to establish prior quarrels, antagonism and enmity between a defendant and the victim and the making of threats by the former is properly admissible to show motive]; *People v. Zack* (1986) 184 Cal.App.3d 409, 415 [where a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered to prove disputed issues such as identity, intent, and motive are admissible based solely upon the consideration of identical perpetrator and victim].) A defendant is not entitled to have the jury determine his guilt or innocence on a false presentation that his and the victim's relationship was peaceful and friendly. (*McCray*, at p. 172; *Zack*, at p. 415.) While *McCray*, *Linkenauger*, and *Zack* were domestic violence prosecutions, the reasoning underlying the rule that evidence of prior threats, violence, discord, or conflict between the defendant and victim is admissible to establish motive is no less probative in an elder abuse prosecution charging an act of violence or threat of violence.

20

Although Evidence Code section 1101, subdivision (b), was not expressly cited by the trial court as a basis for its ruling, the prosecutor did argue in the in limine motion that the evidence was admissible to establish defendant's intent, the reasonableness of the victim's fear and motive, and the trial court did acknowledge that prior threats were relevant to prove the victim's fear. We will affirm the trial court's evidentiary ruling if it is correct on any theory of law applicable to the case, even if for reasons different than those expressly stated by the trial court. " ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976.) Accordingly, we conclude the prior elder abuse evidence here was also probative of defendant's motive to commit all of the charged offenses.

Thus, the prior elder abuse evidence here was relevant and probative of: (1) defendant's propensity to abuse elders; (2) his intent to threaten Bonnie and place her in fear; (3) whether Bonnie was placed in sustained fear; (4) whether Bonnie's fear was reasonable; and (5) defendant's motive for abusing, assaulting, and threatening Bonnie.

### 3. Undue Prejudice

We next balance the probative value of the prior abuse evidence against the Evidence Code section 352 undue prejudice that defendant claims. Evidence is not inadmissible under section 352 unless the probative value is "substantially' outweighed by the probability of a 'substantial danger' of undue prejudice." (*Holford, supra*, 203 Cal.App.4th at p. 167.)

We conclude that the evidence at issue here was not unduly prejudicial. " ' "[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant,

21

highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " (*Holford, supra*, 203 Cal.App.4th at p. 167, italics omitted.)

The potential prejudice claimed here by defendant was that the jury would consider the evidence as propensity evidence to prove conduct in conformity therewith on the occasion in question. However, in enacting Evidence Code section 1109, subdivision (a)(2), the Legislature has essentially transferred propensity from the undue prejudice side of the balance to the probative value side.

In further support of his prejudice argument, defendant asserts that the prior threats were far more inflammatory than the charged conduct. We disagree. The prosecutor ultimately sought to elicit evidence of recent threats made by defendant against Bonnie, including a threat to slit her throat, in addition to prior incidents when defendant battered Bonnie. We do not consider this evidence to be more inflammatory than the charged conduct, in which defendant was alleged to have swung pruning shears at Bonnie, missing her neck by inches, and threatened her life or threatened to "get" and "possibly kill her." It certainly was not so much more inflammatory that it caused Evidence Code section 352 prejudice. (See *People v. Williams* (2008) 159 Cal.App.4th 141, 147 (*Williams*) [in a case involving application of Evid. Code, § 1109, subd. (a)(2), prior acts were very similar to, and were no more inflammatory than, the acts with which the defendant was charged]; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029 [Evid. Code, § 1109 evidence relevant to domestic violence was admissible, in view of the fact that the subject evidence involved the defendant's history of similar conduct against the same victim and the evidence was not unduly inflammatory].)

22

Defendant contends that, because the uncharged acts did not result in criminal convictions, there was a risk that the jury may have been tempted to punish him for the uncharged acts. This risk was noted in *People v. Ewoldt* (1994) 7 Cal.4th 380, 405. There, our high court observed that when a defendant has not been convicted of crimes related to prior conduct, there is an increased danger that the jury might be inclined to punish the defendant for the uncharged offenses, regardless of whether it considered him guilty of the charged offenses. (*Ibid*.) The court also noted there is also an increased risk of confusing the issues, because the jury has to determine if the uncharged offenses had occurred. (*Ibid*.) Thus, normally, the absence of criminal convictions weighs only on the undue prejudice side of the Evidence Code section 352 balancing scale. Defendant contends the trial court failed to recognize that the lack of prior convictions was a factor weighing in favor of prejudice here. To the contrary, the court did consider this circumstance, but then impliedly concluded the absence of convictions also had probative value. Unlike in the usual situation, there is probative value associated with the fact that there were no prior convictions in that the victim's failure to call the police or follow through with prosecutions was consistent with and helped explain the victim's reluctance to testify in this case. This must be added to the probative value side of the Evidence Code section 352 scales here along with the probative value we have already discussed.

Additionally, the jury instructions on reasonable doubt, the necessity of proof of the elements of the offenses, the limited purpose for which the evidence of the prior abuse was admitted and the requirement that the prior abuse had to be proven by a preponderance of the evidence substantially reduced the risk of prejudice. The limiting instruction told the jury: "If you decide that the defendant committed the uncharged abuse of an elder, you may but are not required to conclude from that evidence that the defendant was disposed or inclined to commit abuse of an elder person and based on that decision also conclude that the defendant was likely to commit the crime of elder abuse or crimes involving abuse of an elder. [¶] If you conclude that the defendant committed

23

the uncharged abuse of an elder, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of elder abuse or crimes involving abuse of an elder. The People must still prove each charge beyond a reasonable doubt." (CALCRIM No. 853, as given to the jury in this case.) We must assume the jury followed these instructions. (*People v. Lindberg* (2008) 45 Cal.4th 1, 25-26; *People v. Panah* (2005) 35 Cal.4th 395, 492.)

The primary thrust of defendant's prejudice argument is that, because the trial court misapprehended the nature of the defense theory regarding the prior threats and abuse evidence, it failed to appreciate the potential for undue prejudice that would result from the admission of the evidence, and thus abused its discretion in its Evidence Code section 352 balancing analysis. Specifically, at the time it ruled on the in limine motion, the court verbalized its understanding of the defense theory as being that, while defendant may have made previous threats, they were hollow, nothing more than "hot air." However, at trial defendant sought to prove he had never made the prior threats. In this regard, defendant asserts that the trial court overvalued the probative value and undervalued the prejudice to him because the court was laboring under the incorrect assumption that defendant was going to admit making the prior statements alleged to be threats.

But trial counsel did not alert the trial court to the alleged fallacy in the court's reasoning. Counsel said nothing about how the defense planned to address the prior abuse evidence. Thus, while we have no qualm with defendant's assertion that a defendant's theory concerning other crimes evidence and how he intends to meet that evidence can be factored into a trial court's Evidence Code section 352 analysis, the trial court here could not do so because defendant never revealed his plans to the trial court. In determining whether the trial court abused its discretion, we must focus on what the court was made aware of at the time it ruled on the motion, not on evidence that came out or circumstances that took place during the trial. "To do otherwise would require us to

24

hold the trial court to an impossible standard." (*People v. Hernandez* (1999) 71 Cal.App.4th 417, 425 [consideration of facts that came out during the trial is inappropriate in determining whether the trial court abused its discretion in making an evidentiary ruling at the beginning of the trial].) Moreover, a party cannot argue on appeal that the trial court erred in failing to conduct an analysis it was not asked to conduct.[9] (*Holford, supra*, 203 Cal.App.4th at p. 169.)

Defendant also contends that the trial court's verbalization of how it anticipated defendant would address the prior abuse evidence "r[an] the risk of coercing a particular defense." We disagree. First, the defense at trial argued to the jury that defendant had not made prior threats. Thus, it would seem defendant was not coerced into adopting a different defense from what defendant now claims his defense was at the outset. Second, we cannot consider defendant to have been coerced to adopt a particular defense articulated by the court, when defendant had every opportunity to correct the court as to the true nature of his defense.

In any event, we disagree with defendant that, merely because he allegedly planned to dispute the veracity of the prior abuse evidence, the trial court failed to appreciate the potential for undue prejudice related to the admission of this evidence. We are of the opinion the evidence here simply was not the type of evidence " ' " 'which uniquely tends to evoke an emotional bias against the defendant as an individual *and*

---

[9] We also do not agree with defendant that the trial court abused its discretion in performing its Evidence Code section 352 balancing analysis "by assuming facts not supported by the record." Defendant's reliance on *People v. Cluff* (2001) 87 Cal.App.4th 991 to support this argument, an appeal dealing with information upon which a trial court based a decision not to dismiss prior strike convictions, is completely misplaced. Moreover, as we discuss *ante*, even if the court had had a better understanding of what defendant claims his position was at the time of the ruling, we conclude that the court nevertheless would not have abused its discretion in allowing the prior abuse evidence based on the other facts before the trial court.

*which has very little effect on the issues.*' " ' " (*Holford, supra*, 203 Cal.App.4th at p. 167.)  Instead, the "prejudice" implicated by this evidence was, in fact, that which " ' "naturally flows from relevant, *highly probative* evidence." ' " (*Id.* at p. 167, italics added.)  We conclude that whether defendant contested the evidence of prior acts or admitted the prior conduct was of little significance to the question of whether defendant would suffer undue prejudice from its admission.  As the People argue, even if the court had not considered the possibility of defendant using the evidence to his advantage by arguing that he had made hollow threats in the past and that his present threat, if made, was therefore not made with the specific intent that the statement be taken as a threat, the probative value of the evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.  (Evid. Code, § 352.)  Thus, had the court a better understanding of what defendant belatedly claims his secret theory was, we conclude that the trial court nevertheless would not have abused its discretion in granting the People's in limine motion to admit the prior threats evidence based on the other facts before the court at the time the court ruled on the motion.

Because we conclude that the evidence at issue was highly probative, and that it was not unduly prejudicial, we further conclude that the trial court did not abuse its discretion in granting the People's in limine motion to admit the prior threats evidence.

### 4.  Due Process

Defendant also asserts that the misapplication of Evidence Code section 352 resulted in a federal due process violation because the other crimes and misconduct evidence was highly inflammatory, and the fact that he had not been convicted based on the prior acts invited the jury to punish him here for those acts.  However, we have rejected both of those contentions, *ante*.  Since we have concluded that the trial court did not abuse its discretion in admitting the evidence at issue here based on a balancing analysis under Evidence Code section 352, we reject defendant's contention, based on the same arguments, that his due process rights were violated.  Moreover, the due process

26

claim defendant makes here has already been rejected in *Williams, supra*, 159 Cal.App.4th at pages 145-148, and we agree with the reasoning in that case.

## II. Sentencing Issues

### A. Additional Background and Defendant's Contentions

On February 28, 2014, defendant pleaded no contest on two other cases pending before the court. In case number 12F9012, defendant pleaded no contest to one count of possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)) and admitted a section 12022.1 enhancement allegation. In case number 13F1002, defendant pleaded no contest to one count of willful failure to appear. (§ 1320, subd. (b).) Pursuant to the plea agreement, defendant was to be sentenced to a term of three years four months to run consecutive to the sentence imposed in the elder abuse case and case number 11F4087, in which a different jury found defendant guilty of burglary in the second degree (§§ 459, 460) and petty theft (§§ 484, 488). Additionally, the trial court had found a section 667.5, subdivision (b), enhancement allegation to be true.

On March 27, 2014, the trial court sentenced defendant to a term of nine years on this case, calculated as follows: the upper term of four years on count one, elder abuse, plus a consecutive term of two years for the section 12022.1 enhancement and an additional consecutive term of one year for the section 667.5, subdivision (b), enhancement; the midterm of two years on count three, making criminal threats, to run concurrently with count one; the midterm of two years on count five, attempting to dissuade a victim or witness, to run consecutively with count one. Without stating or imposing a sentence, the court stayed imposition of sentence pursuant to section 654 on count two, assault with a deadly weapon, and count four, exhibiting a deadly weapon. The court also sentenced defendant in accordance with the plea agreement in case numbers 13F1002 and 11F4087. Defendant was originally sentenced to a total aggregate term on all of his cases of 12 years 4 months.

27

On May 15, 2015, the trial court resentenced defendant following his petition for resentencing pursuant to Proposition 47 on the felony case that was the basis for the section 12022.1 enhancement. (See § 1170.18.) On the elder abuse case, the trial court resentenced defendant to four years on count one plus one year for the enhancement pursuant to section 667.5, subdivision (b). The court dismissed the enhancement pursuant to section 12022.1. On count three, the trial court sentenced defendant to a term of eight months to run consecutively with the sentence imposed on count one. On count five, the court imposed a sentence of two years to run consecutively with the sentences imposed on counts one and three. The court again stayed the imposition of sentence on count two without imposing a sentence. The court did not refer to count four.

The trial court imposed a restitution fine pursuant to section 1202.4 of $280 for each felony conviction in all four of his cases. The court said $280 was the statutory minimum fine. The total number of felony convictions at the time of the initial sentencing was eight. The trial court aggregated the fines and imposed a total restitution fine of $2,340. Specifically, the court said, "With regard to the Section 1202.4, restitution fine would be 200 -- well, $280 for each offense. That's the mandatory minimum. . . . So the total 1202.4 restitution fine is $2,340. That's $280 for each felony count." The court also imposed parole revocation restitution fines in the amount of $2,340, which the court suspended unless parole was revoked.[10]

When the trial court resentenced defendant pursuant to Proposition 47 on May 15, 2015, with regard to case number 13F6477, the trial court, inter alia, again stayed the imposition of sentence on count two and did not refer to count four.

---

[10] The trial court cited section 1202.4 as the statutory basis for the suspended parole revocation restitution fines. Although the court did not refer to section 1202.45, it necessarily imposed the parole revocation restitution fines pursuant to section 1202.45, in conjunction with section 1202.4.

28

Defendant asserts that the court violated ex post facto rules by imposing, on two of the convictions, restitution fines that were higher than the minimum authorized at the time of the actions giving rise to those convictions. Defendant requests that we reduce those fines to the amount of the statutory minimum at the relevant times. Defendant also asserts that the trial court erred in imposing a restitution fine on count two, which was a stayed sentence pursuant to section 654. To correct this error, defendant requests that we stay this restitution fine imposed on his assault conviction in case number 13F6477. Additionally, defendant asserts that the trial court miscalculated the aggregate amount imposed in restitution and parole revocation fines.

The People agree with defendant as to all of these issues. However, the People also note that the trial court failed to impose a $100 restitution fine based on defendant's misdemeanor conviction in case number 11F4087 and request that we impose it here. Defendant agrees.

The People have forfeited their contention and defendant has forfeited each of his contentions with the exception of the restitution fine imposed on the stayed sentence. As to that contention, the proper remedy is to reduce the total restitution fine imposed in case number 13F6477 by $280. Finally, because the trial court failed to impose sentences on the two counts and stay execution of these sentences, we do so here.

### B. Restitution Fines and Ex Post Facto Principles

Penal Code section 1202.4, subdivision (b)(1), provides in part: "*In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record.*" (Italics added.) That subsection continues: "(1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than two hundred forty dollars ($240) starting on January 1, 2012, two hundred eighty dollars ($280) starting on January 1, 2013, and three hundred dollars ($300) starting on

29

January 1, 2014, and not more than ten thousand dollars ($10,000)." (§ 1202.4, subd. (b)(1).) Restitution is imposed under the law applicable at the time of the offense, not at the time of sentencing. (*People v. Souza* (2012) 54 Cal.4th 90, 143.) Section 1202.4, subdivision (b)(2), provides: "In setting a felony restitution fine, the court *may* determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (Italics added.) Here, instead of employing the statutorily recommended formula for each case, the trial court simply imposed a restitution fine of $280 for each felony count; thus multiplying $280 by the number of felony counts for all of defendant's cases and stating one aggregate restitution fine.[11] The court did not then multiply the product of $280 times the number of counts by the number of years imposed, so the total amount of restitution fine is less than even that contemplated by the statutorily recommended formula.

A restitution fine is considered punishment for purposes of ex post facto analysis. (*People v. Hanson* (2000) 23 Cal.4th 355, 360-362; *People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248.) In *Tapia v. Superior Court* (1991) 53 Cal.3d 282, the California Supreme Court held that a change in the law making conduct a crime when it

---

[11] It was error to state one aggregate fine for all of defendant's cases. Section 1202.4, subdivision (b)(1), provides that the court shall impose a "separate and additional" restitution fine in "every case." Thus, the trial court should have imposed separate restitution fines in each of defendant's four cases. (See *People v. Soria* (2010) 48 Cal.4th 58, 62-63 [when separate pleas are entered in separately charged cases, " 'every case' " means each case filed against the defendant]; *People v. Schoeb* (2005) 132 Cal.App.4th 861, 863-865 (*Schoeb*) [trial court properly imposed five different restitution fines on each of the defendant's five cases].) However, since the aggregate amount is the same, the error is harmless. Nonetheless, the abstract of judgment indicates the entire aggregate fine is for "Case A," which is case number 13F6477, the elder abuse case. The abstract must be corrected to break down the amount of restitution fine as to each case.

had not been a crime prior to the change, or increasing punishment for a crime, or eliminating a defense, violate ex post facto principles if the new law is applied retrospectively. (*Tapia*, at p. 298.)

In August 2011, at the time defendant committed the earliest of the felonies of which he was convicted in connection with case number 11F4087, the statutory minimum restitution fine was $200. (Former § 1202.4, subd. (b)(1); Stats. 2011, ch. 45, § 1, eff. July 1, 2011.) At the time he committed the felony in case number 12F9012, in 2012, the minimum restitution fine was $240. As to both of these crimes, as well as the others, the trial court imposed restitution fines of $280.

Defendant did not object to the amount of restitution fines imposed at sentencing. Additionally, while the specific restitution fines discussed above may not have been the statutory minimum fines applicable at the time of the relevant offenses, they were within the lawful statutory discretionary range. The maximum fine at all times for each case was $10,000. Thus, there is no ex post facto violation because the court did not impose an amount it was not authorized to impose in 2011 and 2012.

As for any statutory claim related to the restitution fines, because defendant did not object to the amount of the restitution fines in the trial court, and because the amounts imposed for these two specific restitution fines (and the corresponding parole revocation fines) were not unauthorized, his belated challenge to the amount of those fines is forfeited. (*People v. Smith* (2001) 24 Cal.4th 849, 852 [claim raised for the first time on appeal regarding the trial court's failure to properly make discretionary sentencing choice is forfeited].) "Although the court is required to impose sentence in a lawful manner, counsel is charged with understanding, advocating, and clarifying permissible sentencing choices at the hearing. Routine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention. As in other waiver cases, we hope to reduce the number of errors committed in the first instance and preserve the judicial resources otherwise used to correct them." (*People v. Scott* (1994) 9 Cal.4th 331,

353 (*Scott*).) Here, had defendant raised the 2011 and 2012 minimum fine amounts below, the trial court could have changed the amount of the fines if it was so inclined. Because defendant did not, he may not challenge these fines on appeal.

### C. Restitution Fines and Stayed Sentences

Section 654, subdivision (a), provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Where a court stays a sentence pursuant to section 654, it is error to impose restitution fines based on those convictions. (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483; see also *People v. Le* (2006) 136 Cal.App.4th 925, 934 (*Le*) ["the section 654 ban on multiple punishments is violated when the trial court considers a felony conviction for which the sentence should have been stayed pursuant to section 654 as part of the court's calculation of the restitution fine under the formula provided by section 1202.4, subdivision (b)(2)"].)

Defendant's failure to object to the imposition of a restitution fine on a stayed count does not constitute forfeiture of the section 654 issue. "It is well settled . . . that the court acts 'in excess of its jurisdiction' and imposes an 'unauthorized' sentence when it erroneously stays or fails to stay execution of a sentence under section 654." (*Scott, supra*, 9 Cal.4th at p. 354, fn. 17.) Further, "our Supreme Court has established the general rule that section 654 'prohibits the use of a conviction for any punitive purpose if the sentence on that conviction is stayed.' " (*Le, supra*, 136 Cal.App.4th at p. 933.)

Because his sentence of assault with a deadly weapon or instrument (§ 245, subd. (a)(1)) charged in count two in case number 13F6477 was stayed pursuant to section 654, we agree with defendant and the People that the trial court erred to the extent that the restitution fine it imposed included $280 for that count. And because a section

32

654, violation results in an unauthorized sentence (*Scott, supra*, 9 Cal.4th at p. 354, fn. 17), this issue was not forfeited.

Defendant suggests we should stay the restitution fine for his conviction on count two. We decline to follow defendant's suggestion. Defendant's suggestion does not recognize that restitution fines are not imposed per count, they are imposed per case. (See fn. 11, *ante*.) In employing the statutory formula to arrive at a total restitution fine for a case, the court may multiply the minimum fine times the number of counts times the number of years imposed as the sentence in that case. The act of multiplying the minimum fine times the number of counts in making a discretionary decision as to the amount of the fine for a case is not the same as imposing a separate fine for each count. Thus, the appropriate remedy is to back out of the calculation the count that is subject to section 654 and subtract $280 from the total restitution fines for the case. Although not explained, this is what the court in *Le* did and we follow that court's lead. (*Le, supra*, 136 Cal.App.4th at pp. 935-936.)[12]

### D. Total Amount of Restitution Fines

Defendant asserts that the trial court miscalculated the total amount imposed in restitution fines, observing that, even if the $280 statutory minimum figure were correct, and even if a restitution fine could be imposed on the stayed conviction, the total amount imposed is not the correct product of the $280 figure multiplied by the total number of

---

[12] On this point, we decline to follow the court in *Sencion, supra*, 211 Cal.App.4th 480. That court concluded that, because the total restitution fines imposed were within the permissible statutory range, the defendant sustained no prejudice as a result of, inter alia, the erroneous imposition of restitution fines on counts that were stayed. (*Id*. at p. 483.) However, in our view, because the failure to apply section 654 is an error that cannot be forfeited, it is clear that defendant has suffered prejudice. The cases on which *Sencion* relies for the proposition that the defendant was not prejudiced do not address this issue, but rather discuss the valid imposition of separate restitution fines in multiple cases that have been consolidated. (See *Schoeb, supra*, 132 Cal.App.4th at pp. 864-865, and cases discussed therein.)

felony convictions. As we have noted, defendant was originally sentenced on eight felony convictions. (8 x $280 is $2,240, not $2,340.)

Like the matter of the applicable statutory minimum restitution fee, defendant's failure to raise the miscalculation before the trial court resulted in forfeiture of the issue. Such error easily could have been considered and corrected if brought to the trial court's attention. (See *Scott, supra*, 9 Cal.4th at p. 353.) Moreover, with the exception of the restitution fine related to the stayed sentence, an amount imposed between the statutory minimum and $10,000 was authorized by law. Thus, unlike factoring into a calculation a count stayed pursuant to section 654, the court's miscalculation of the fine did not result in the court acting in excess of its jurisdiction or imposing an unauthorized sentence.

Finally, by similar rationale, the People forfeited their contention that the court was required to impose a $100 restitution fine on defendant's conviction of a misdemeanor committed in 2011 charged in case number 11F4087. (See *People v. Tillman* (2000) 22 Cal.4th 300, 303 [prosecutor's failure to object to the trial court's omission of a restitution fine without stating reasons forfeited the issue on appeal]; *People v. Turrin* (2009) 176 Cal.App.4th 1200, 1208, fn. 3 [*Tillman* is still good law and was not legislatively overruled by section 1202.46, which was effective at the time the California Supreme Court decided *Tillman*]; but see *People v. Zackery* (2007) 147 Cal.App.4th 380, 388-389; *People v. Moreno* (2003) 108 Cal.App.4th 1.)

### D. Prison Sentences Stayed Pursuant to Section 654 in Case No. 13F6477

As it did at the original sentencing proceeding, at resentencing, the trial court did not impose a sentence on count two, to then be stayed pursuant to section 654. Instead, the trial court only stated, in pertinent part, "AS PENALTY THEREFOR, THE COURT ORDERS *the punishment* is **stayed** pursuant to Penal Code Section 654." (Italics added.) Moreover, while, at the original sentencing proceeding, the trial court did the same in connection with count four, at resentencing, the trial court omitted reference to count four altogether.

"[W]hen a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence . . . ." (*People v. Duff* (2010) 50 Cal.4th 787, 796 (*Duff*); see *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469 (*Alford*); *People v. Niles* (1964) 227 Cal.App.2d 749, 755-756.)  Even though section 654 requires that the sentences imposed on counts two and four be stayed, the trial court was nevertheless required to impose judgment on each count, which involves selecting a term, and then stay execution on these counts, the stay to become permanent upon defendant's service of the portion of the sentence not stayed. (*People v. Salazar* (1987) 194 Cal.App.3d 634, 640; see *Duff*, at p. 796.)  "This procedure ensures that the defendant will not receive 'a windfall of freedom from penal sanction' if the conviction on which the sentence has not been stayed is overturned." (*Salazar*, at p. 640.)  The trial court thus "committed unauthorized sentencing error by failing first to pronounce sentence on [these counts] and then stay execution of [those] sentence[s]." (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1327; see *Alford*, at p. 1472.)  Because this aspect of the sentence was unauthorized, we reach this issue notwithstanding the fact that it was raised by neither defendant nor the People.

As in *Alford*, we see no reason to remand for resentencing, but will instead exercise our authority to modify the judgment.  (§ 1260; *Alford, supra*, 180 Cal.App.4th at p. 1473 [rather than remand for a new sentencing hearing, appellate court imposed the sentence the trial court would have "undoubtedly" imposed].)  At resentencing, the court imposed an upper term of four years on count one, elder abuse, plus a one-year enhancement pursuant to section 667.5, subdivision (b).  It is clear that the trial court would have imposed an upper term of four years on count two, assault with a deadly weapon, with a one-year enhancement pursuant to section 667.5, subdivision (b). Similarly, because the trial court imposed the upper term on count one, it is clear the court would have imposed the maximum sentence of one year on count four, exhibiting a deadly weapon.

Accordingly, we impose and stay execution of a sentence of four years plus a one-year enhancement on count two, the stay to become permanent on the completion of sentence as to count one, and impose and stay execution of a sentence of one year on count four, the stay to become permanent on the completion of sentence as to count one. (See *Duff, supra*, 50 Cal.4th at p. 796.)

## DISPOSITION

The judgment is modified to: (1) recalculate the restitution fines for each of defendant's cases separately by noting the restitution fine for each case (see fn. 11, *ante*); (2) to reduce the total restitution fine in 13F6477 by $280; (3) impose an upper term sentence of four years on count two, assault with a deadly weapon (§ 245, subd. (a)(1)) and a consecutive sentence of one year for the prior prison term enhancement (§ 667.5, subd. (b)), and stay execution of those sentences pursuant to section 654; and (4) impose a sentence of one year on count four, exhibiting a deadly weapon (§ 417, subd. (a)(1)), and stay execution of that sentence pursuant to section 654. As so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting these modifications and forward a copy to the Department of Corrections and Rehabilitation.


       MURRAY      , J.

We concur:


    ROBIE     , Acting P. J.


    MAURO    , J.

36