Filed 12/16/21  P. v. Morales CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS VELASCO MORALES,<br><br>    Defendant and Appellant. | D079041<br><br><br>(Super. Ct. No. 16CR06619) |


APPEAL from a judgment of the Superior Court of Santa Cruz County, John Steven Salazar, Judge.  Affirmed.

Rudolph J. Alejo, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Karen Z. Bovarnick, Deputy Attorneys General, for Plaintiff and Respondent.

In an incident in a parking lot after their son's soccer game, Jesus Velasco Morales pulled a gun on his estranged wife and threatened to kill her.  He subsequently sent her offensive and harassing text messages,

violating a criminal protective order precluding him from contacting her except to arrange the peaceful exchange of their son. He was charged with making criminal threats (Pen. Code, § 422), assault with a firearm (*id.*, § 245, subd. (a)(2)), battery (*id.*, § 243, subd. (e)(1)), and three misdemeanor counts of contempt of court for violating the criminal protective order (*id.*, § 166, subd. (c)(1)). At trial, the jury heard evidence regarding the charged offenses as well as evidence of prior uncharged incidents of domestic violence pursuant to Evidence Code section 1109.[1] The jury convicted him on all counts.

On appeal, Morales contends the trial court should not have mentioned the three misdemeanor counts—violations of the criminal protective order—in the instruction allowing incidents of domestic violence to be used as propensity evidence pursuant to section 1109. Morales reasons that these offenses do not constitute domestic violence within the meaning of the statute because they did not involve physical force or a threat of physical force. Because these offenses fall within a broader definition of domestic violence, which is not limited to acts of physical violence or the threat of physical violence, we reject Morales's claim of error and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Jessica R. married Morales in March 2009 when they were both teenagers. They had a son together and lived with Jessica's parents. Jessica had a good relationship with her husband until she went back to school in 2012. Morales became jealous; he called and texted her constantly to ask who she was with and what she was doing.

---

[1] Unless otherwise specified, statutory citations are to the Evidence Code.

2

In 2015, Morales became violent with her for the first time when she was at home with him and their son. After Jessica told Morales she did not want to spend her birthday with him, they got into a "big argument" and Morales started hitting her with the bow portion of a toy bow and arrow. He hit her legs, and after she fell to the floor, he started hitting her on her back. Jessica yelled for him to stop, but he only stopped when their son began crying. She had bruises on her arms and legs and a cut on her finger. She took photographs of the injuries; the images were shown to the jury. She told her cousin about the attack but did not call the police.

Jessica and Morales broke up but got back together after a few months. Jessica explained she thought the abuse "was just a one-time thing," and she wanted to keep the family together. Initially, things "seemed to be going well," but after several months, Morales "started to bring up his old patterns of thinking that [Jessica] was cheating on him again."

In early 2016, Morales was physically violent with Jessica again. She testified that they got into an argument and Morales got angry. He dragged her across the floor (from their bedroom to the living room); slammed her "up against things"; grabbed her again by the back of her head and let go; and then grabbed again and "smacked" her on her face with either a closed fist or a slap while she was on the floor. Jessica thought he was going to kick her, but their son came into the room and he stopped. During the attack, Morales called Jessica names like "slut," "whore," and "bitch." She had a mark on her face after the attack. She took a picture of it; the photo was shown to the jury.[2]

---

[2] Jessica testified she took the photographs "[t]o remind [herself] why [she] wasn't going back." In addition to the two prior incidents of physical violence, Jessica recalled other "arguments in the car" when Morales "would do like one punch to the side of [her] body" while she was driving.

3

Jessica told Morales to leave and that she was going to file for divorce. He refused to leave, so Jessica took their son to her cousin's house. She only went home after her parents were there; she told them she "couldn't do it anymore" and asked them to ask him to leave, at which point he did.

After Morales moved out, he began to harass and threaten Jessica. Once, when they met to exchange custody of their son, Morales asked if Jessica would join him with their son to eat. When she refused, Morales became angry and called her names. Morales repeatedly showed up at Jessica's workplace unannounced. On one occasion, he questioned her about who she was seeing and accused her of leaving him for someone else. On another occasion, after she refused to speak to him, he told her that he was going to shoot her in the head.

On October 1, 2016, Jessica and her parents went to a park to watch her son's soccer game. Morales was also there. During the game, Morales "seemed fine" and Jessica did not "see anything out of the ordinary." After the game, Jessica's uncle took her son to play with his cousins, and her parents went home. Morales asked Jessica if they could "grab coffee" and talk. Jessica was hesitant, but she accepted because she "wanted to have some type of good relationship for [their] son."

Jessica wanted to take separate cars, but Morales asked to come in hers, claiming he was having car trouble. Jessica felt uncomfortable but agreed. Morales got into the car's passenger seat and began questioning Jessica, asking her who she had been talking to and who she was seeing. Jessica told him she did not want to talk about anything not concerning their son. He pulled a gun from his waist band and "pulled it back on the top." He pushed the gun into her ribs while grabbing her arm to hold onto her. He said he was going to shoot her if she did not answer his questions. Jessica

4

was terrified and thought he would kill her. Jessica opened her car door and cried out, hoping to draw attention in the parking lot. She cried and pleaded with Morales not to hurt her, while he told her to "get into the car and drive." Then Morales removed the magazine from the gun—Jessica said she thought he did it "to calm [her] down"—and pointed the gun toward the floor of the car. Jessica "decided to try and fight him for the gun." At some point during the struggle, they both fell out of the vehicle on the passenger's side. Morales reached back for the magazine which had fallen inside the vehicle, and Jessica got up and drove away.

Jessica drove to her cousin's house and later went to the sheriff's office to report the incident. At the sheriff's station, a deputy recorded Jessica's statement, which was played for the jury. She told the deputy she was "terrified" when it happened, and feared he was going to kill her. The deputy who took Jessica's statement testified that Jessica was "[v]isibly scared," "tearing up," and crying when she described the incident.[3]

A sheriff's deputy arrested Morales later in the evening, after taking Jessica's statement. When officers searched the house where Morales was located, they found a magazine or "clip" for a nine-millimeter pistol in or near a closet in which Morales's identification card was also found. A sheriff's deputy interviewed Morales, and an audio recording of the conversation was played for the jury. During the interview, Morales told the deputy, "I was with that chick for ten years, saving money and she fucking cheated on me," and "[s]he just fucked my life over man." He told the deputy he had gone to

---

[3] Immediately after the incident in the parking lot, Jessica did not believe she had any injuries. However, a bruise that "looked like a finger indent" later developed on her right forearm, where Morales had grabbed her while he held the gun to her. A law enforcement officer photographed the bruise on October 5, and the image was shown to the jury.

5

soccer with his son, and that he and Jessica "got into an argument in there, like, and then after I just went for a very—very long walk." He said she made "a smart fricking comment," "like, I don't want to talk to you." He denied getting in her car, pulling out a gun, and pointing a gun at Jessica, but said, "I knew that she was [going] to say that . . . ."[4] He denied owning a gun. The deputy testified that Morales "was upset" when he was discussing his marital problems with Jessica.

On October 7, 2016, a boy and his mother found a nine-millimeter pistol at a park near the soccer fields and called law enforcement. A sheriff's deputy collected and impounded the weapon as evidence. Subsequent DNA analysis showed "very strong support" that Morales was the major contributor to the DNA found on the pistol, with lesser contributors being the boy and mother who found the pistol. The magazine seized from the home where Morales was arrested was determined to be compatible with the gun discovered at the park.

Jessica obtained a protective order that precluded all contact with Morales other than for peaceful exchange of their son for visitation purposes. Morales was served with the protective order on October 5, 2016. Afterward, on three occasions, he sent offensive, harassing text messages in violation of the protective order. On December 10, 2017, after Jessica sent a text message attempting to coordinate exchange of their son, Morales sent a series of text messages berating her. He called her a "selfish piece of shit" who does not "deserve to be call[ed] mom," a "bitch," a "pendeja," and "a

---

4 A sheriff's deputy had coordinated with Jessica to send Morales a pretext communication via text, to see if he would admit his conduct. Jessica texted, "How could you do that to me, [Morales]? How could you do that with all these children around? Why would you bring a gun to your son's soccer game?" Morales responded, "What are you talking about?"

6

whore." On March 1, 2018, again after Jessica sent a text message attempting to coordinate exchange of their son, Morales responded by calling Jessica a "[s]nitch," which she understood as a reference to her report of the assault to the police. On March 29, 2018, after Jessica texted to remind Morales that child support was due soon, Morales responded using profanity, calling her a "fucking bitch piece of shit" and warned her to "[k]eep running u fucking mouth bitch [sic]." Jessica testified the messages made her feel bad and belittled. She agreed with the prosecutor they were an accurate depiction of the verbal abuse inflicted by Morales.

Morales testified in his defense. He denied striking Jessica with the bow and denied pulling her hair and striking her face. He claimed they separated because she was having an affair. He claimed he was not angry or upset she had an affair, just surprised and hurt.[5] He denied attacking Jessica after the soccer game. He claimed that after the game, they spoke briefly about their son going with Jessica's uncle, and then he left alone to eat at a nearby restaurant while he waited for his brother because his car was not working. He denied his DNA was on the gun found at the park and claimed he had never touched a gun.[6] He admitted he was served with the protective order and understood it precluded all contact with Jessica, except to arrange the peaceful exchange of their son. But he denied sending the abusive text messages and claimed he had never seen them before. He claimed they had been sent by an ex-girlfriend who had been stalking him.

---

[5] Morales repeatedly denied that he was ever angry with Jessica, denied using words of anger, and claimed that they did not get into "a lot of arguments," only "disagreements."

[6] Morales denied that it was his DNA found on the gun, and insisted, "I never touched no gun. That's my answer."

7

The district attorney charged Morales with one felony count of making criminal threats (Pen. Code, § 422; count 1), one felony count of assault with a firearm (*id.*, § 245, subd. (a)(2); count 2), one misdemeanor count of battery (*id.*, § 243, subd. (e)(1); count 3), and three misdemeanor counts of contempt of court for violating the protective order (*id.*, § 166, subd. (c)(1); counts 4-6). Counts 1 through 3 were based on the October 1, 2016 incident following the soccer game, and counts 4 through 6 were based on the dates of the text messages—December 10, 2017, March 1, 2018, and March 29, 2018, respectively.

The jury found Morales guilty on all counts. The trial court sentenced him to the middle term of three years in state prison on count 1, a concurrent middle term of two years on count 2, plus concurrent terms of 30 days each on counts 3 through 6.

## DISCUSSION

Morales contends the conduct underlying his contempt convictions—sending abusive text messages in violation of a no-contact criminal protective order—does not constitute domestic violence under section 1109 and

therefore should not have been included in the corresponding instruction on propensity evidence. We reject Morales's claim of instructional error.[7]

A. *Governing Legal Principles and Standard of Review*

"Section 1101(a) prohibits the admission of character evidence if offered to prove conduct in conformity with that character trait, sometimes described as a propensity to act in a certain way." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405-406, fn. omitted (*Bryant, Smith & Wheeler*).) Although evidence of a defendant's other criminal conduct is generally not admissible to prove a propensity to commit the charged crime (§ 1101, subd. (a)), "[i]n domestic violence cases, Evidence Code section 1109 ' "permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes." ' " (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1075, fn. omitted; see *People v. Fruits* (2016) 247 Cal.App.4th 188, 202 ["section 1109 is an express exception to the prohibition against propensity evidence set forth in Evidence Code section 1101, subdivision (a)," and "allows a jury to draw propensity inferences from prior acts"].)

---

[7] The Attorney General contends Morales forfeited his claim by failing to object to the instruction given. "We may review defendant's claim of instructional error, even absent objection, to the extent [a defendant's] substantial rights were affected." (*People v. Townsel* (2016) 63 Cal.4th 25, 59-60; Pen. Code, § 1259.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087; see also *People v. Mitchell* (2008) 164 Cal.App.4th 442, 465 [" 'Substantial rights' are equated with errors resulting in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 [(*Watson*)]."].) Because Morales contends the jury instruction at issue here is erroneous and impacts his substantial rights, we consider the merits of Morales's claim. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103, fn. 34.)

Section 1109 provides, in relevant part, "in a criminal action in which the defendant is accused of an *offense involving domestic violence*, evidence of the defendant's commission of *other domestic violence* is not made inadmissible by Section 1101 . . . ." (§ 1109, subd. (a)(1), italics added.) As discussed *post*, the phrase "domestic violence" in Evidence Code section 1109—which is defined by reference to two different statutes (the Penal Code and the Family Code)—is in dispute here. There are two corresponding pattern jury instructions for evidence of uncharged domestic violence (CALCRIM No. 852A) and evidence of charged domestic violence (CALCRIM No. 852B), admissible pursuant to section 1109. Morales ostensibly challenges only the latter instruction here.

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

Instructional error requires reversal of the judgment only if it resulted in a miscarriage of justice—which, in this context, means that there is a reasonable probability that the defendant would have achieved a more favorable result in the absence of the error. (Cal. Const., art. VI, § 13; *Watson*, *supra*, 46 Cal.2d at p. 836; see *People v. Moore* (2011) 51 Cal.4th 1104, 1130-1133 [applying *Watson* harmless error analysis to claim of

10

instructional error]; *People v. Falsetta* (1999) 21 Cal.4th 903, 924-925 [applying *Watson* standard to alleged error in failing to instruct jury on proper use of propensity evidence].)

B. *Additional Background*

Prior to trial, the prosecutor moved to introduce evidence of other incidents of domestic violence Morales perpetrated against Jessica as propensity evidence admissible under section 1109. Morales sought to exclude the same evidence. The trial court ruled that the evidence was admissible.

During a break in trial, the parties discussed proposed jury instructions. With respect to the instruction regarding uncharged domestic violence (CALCRIM No. 852A), defense counsel stated he had "[n]o objection." With respect to the instruction regarding charged domestic violence (CALCRIM No. 852B), defense counsel initially objected on the ground that it was "confusing." However, in a subsequent discussion, when the court noted that the People had requested instructions on both uncharged and charged domestic violence offenses, defense counsel stated he had no objection to the instructions.

The jury was instructed with CALCRIM No. 852A, regarding evidence of uncharged domestic violence, as follows:

> "The People presented evidence that the defendant committed domestic violence that was not charged in this case.
>
> "*Domestic violence* means abuse committed against an adult who is a spouse.
>
> "*Abuse* means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.

11

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit the offenses as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged offenses in this case. The People must still prove each charge and allegation beyond a reasonable doubt.

"Do not consider this evidence for any other purpose."

In addition, the jury was instructed with CALCRIM No. 852B, regarding evidence of charged domestic violence, as follows:

"The People presented evidence that the defendant committed *all of the charged offenses* in this case.

"If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit *domestic violence offenses*, and based on that decision, also conclude that the defendant was likely to commit and did commit *the other domestic violence offenses charged* in this case.

12

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge beyond a reasonable doubt." (Italics added.)

C. *Analysis*

The scope of Morales's challenge on appeal is limited. He does not challenge the admission of prior acts of domestic violence involving the use of force or threats of physical violence—including evidence that he struck Jessica with a bow, dragged her across the floor, pulled her hair, and struck her in the face. He also does not challenge the propensity instruction relating to this evidence, or to the charged offenses involving physical force or threats of physical force (counts 1-3). Instead, Morales contends his violations of the criminal protective order (counts 4-6) do not constitute domestic violence— because they "do not constitute an act of physical force . . . nor do they threaten physical force"—and therefore should not have been included in the propensity instruction regarding charged domestic violence (see CALCRIM No. 852B).

As noted *ante*, the instruction regarding charged domestic violence referred to "all of the charged offenses" and therefore included the contempt counts based on the protective order violations when instructing the jury on how to use the propensity evidence. The jury was instructed the People had to prove "the defendant committed one or more of these crimes" beyond a reasonable doubt; the jurors then were told they "may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit *domestic violence offenses*, and based on that decision, also conclude that the defendant was likely to commit and did commit *the other domestic violence offenses charged* in this case." (Italics added.) We conclude the

13

instruction was proper because section 1109 incorporates two definitions of domestic violence, including a definition from the Family Code which is not limited to offenses involving physical violence but rather includes conduct which constitutes harassment and disturbing the peace of the victim. The violations of the protective order fall within this category of offenses for purposes of section 1109, and were properly included within the corresponding jury instructions given here.

Evidence Code section 1109, subdivision (a)(1), provides with exceptions not applicable here: "[I]n a criminal action in which the defendant is *accused of an offense involving domestic violence*, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (Italics added.) Evidence Code section 1109 does not specify which offenses qualify as those "involving domestic violence." Instead, Evidence Code section 1109 incorporates the definition of domestic violence in Penal Code section 13700 and, under certain circumstances, the broader definition in Family Code section 6211. Specifically, Evidence Code section 1109 provides: " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to [Evidence Code] Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (Evid. Code, § 1109, subd. (d)(3).)[8] As the court in *People v. Mani* (2021) 69 Cal.App.5th 799, 814 (*Mani*) explained: "Thus, there are two definitions of domestic violence applicable to

---

[8] It is undisputed here that all of Morales's conduct occurred during this five-year window.

14

section 1109, one in the Penal Code and another in the Family Code." We address each definition below.

Under the Penal Code, " '[d]omestic violence' " is defined as "*abuse* committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." (Pen. Code, § 13700, subd. (b), italics added.) Subdivision (a) of section 13700 of the Penal Code defines " '[a]buse' " as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another."

Evidence Code section 1109, subdivision (d) further defines domestic violence by reference to the Family Code. "The Family Code definition of domestic violence is found in a combination of several provisions. Family Code section 6211, expressly referenced in section 1109, subdivision (d)(3), provides that domestic violence 'is *abuse* perpetrated against' persons with specified relationships, including, as applicable here, [a 'spouse or former spouse.'] (Fam. Code, § 6211, subd. [(a)], italics added.) In section 6203, the Family Code defines *abuse* as any of the following: '(a) (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) *To engage in any behavior that has been or could be enjoined pursuant to Section 6320.* [¶] (b) Abuse is not limited to the actual infliction of physical injury or assault.' (Italics added.)" (*Mani, supra*, 69 Cal.App.5th at p. 814.)

"Family Code section 6320, subdivision (a), referenced in subdivision (a)(4) of Family Code section 6211, lists the following behaviors:

15

'molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating as described in Section 528.5 of the Penal Code, falsely personating as described in Section 529 of the Penal Code, *harassing*, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or *disturbing the peace of the other party*.' (Italics added.) '[T]he plain meaning of the phrase "*disturbing the peace* of the other party" in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party.' (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 [93 Cal.Rptr.3d 723], italics added (*Nadkarni*).)" (*Mani*, *supra*, 69 Cal.App.5th at pp. 814-815.)[9]

[9] At the time of the offenses at issue, subdivision (a) of Family Code section 6320 read: "The court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating as described in Section 528.5 of the Penal Code, falsely personating as described in Section 529 of the Penal Code, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (Stats. 2013, ch. 260, § 2 (Assem. Bill No. 157), operative July 1, 2014). Effective January 1, 2021, Family Code section 6320 was amended to add subdivision (c), which defines " 'disturbing the peace of the other party' " as "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (Fam. Code, § 6320, subd. (c); Stats. 2020, ch. 248, § 2 (Sen. Bill No. 1141).) The legislative history indicates the amendment was intended to "build[] on existing law and [was] not, in any way, meant to reduce the protections available under existing law to victims of domestic violence[.]" (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1141 (2019-2020 Reg.

Here, Morales violated the protective order by sending Jessica harassing, demeaning text messages laced with profanity. At a minimum, Morales's conduct disturbed Jessica's "peace" and harassed her. (See Fam. Code, § 6203.)[10] Morales's actions therefore constituted abuse amounting to domestic violence for purposes of Family Code section 6211. (Fam. Code, §§ 6203, subd. (a)(4), 6320, subd. (a), 6211, subd. (a).) Family Code section 6203, which defines abuse for purposes of Family Code section 6211, expressly states it is "not limited to the actual infliction of physical injury or assault." (Fam. Code, § 6203, subd. (b).) We therefore reject Morales's contention that the court erred when it included acts not involving physical force—i.e., his violations of the protective order—in the propensity instruction relating to charged offenses involving domestic violence. The instruction was proper in light of the broader definition of abuse under the Family Code. (See *People v. Brown* (2011) 192 Cal.App.4th 1222, 1234, fn. 15 ["Family Code section 6211 defines domestic violence 'more broadly' than the more restrictive provisions of Penal Code section 13700."]; *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1144 (*Ogle*) ["[s]ection 1109 applies if the

---

Sess.), as amended Aug. 6, 2020, p. 6.) We refer to the statute as it existed when Morales committed the offenses in this case, but our analysis would remain the same under the amended statute.

10    Morales contends Jessica "never testified that the texts caused her any fear." Given our conclusion that the text messages constitute abuse within the meaning of the Family Code, it is unnecessary for us to determine whether there was sufficient evidence establishing that Morales's actions placed Jessica "in reasonable apprehension of imminent serious bodily injury to . . . herself, or another." (Pen. Code, § 13700, subd. (a); see also Fam. Code, § 6203, subd. (a)(3) [abuse includes conduct which "place[s] a person in reasonable apprehension of imminent serious bodily injury to that person or to another"].)

17

offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code definition"].)

Morales nonetheless contends that, when Evidence Code section 1109 was amended, the Legislature intended to retain the existing, more restrictive definition of "abuse" set forth in Penal Code section 13700, subdivision (a).[11]  In other words, Morales claims Evidence Code section 1109 was amended to include the definition of *domestic violence* in Family Code section 6211, but not the definition of *abuse* in Family Code section 6203.  We reject Morales's arguments as inconsistent with the plain statutory language of Evidence Code section 1109 and Family Code section 6211.  We agree with the court's reasoning in *Mani*: "Family Code section 6211 defines ' "[d]omestic violence" ' as 'abuse perpetrated against' persons with specified relationships.  Family Code section 6203, as is pertinent here, defines abuse as '*any behavior* that has been or could be enjoined pursuant to' Family Code section 6320.  (Italics added.)  Family Code section 6320, subdivision (a) includes harassment and disturbing the peace among the list of behaviors.  We conclude that the plain and unambiguous language of section 1109, subdivision (d)(3), incorporates, in addition to Penal Code section 13700, the Family Code definition of abuse—including the behaviors listed in Family Code section 6230, subdivision (a)(4)—provided that the events occurred within five years of the charged offense.  Thus, encompassed within the meaning of 'offense involving domestic violence' in section 1109 is an offense involving conduct constituting harassment and disturbing the peace of the victim." (*Mani*, *supra*, 69 Cal.App.5th at pp. 815-816, fn. omitted; see *id*. at p. 819 ["Section 1109

_____

[11]   Section 1109 was amended in 2004.  (See Stats. 2004, ch. 116, § 1 (Assem. Bill No. 141); Stats. 2004, ch. 823, § 6.5 (Assem. Bill No. 20).)

clearly and unambiguously incorporates the Family Code definitions of domestic violence *and abuse* without the limitation urged by defendant."], italics added.) Other courts have reached similar results, concluding Evidence Code section 1109 incorporates *both* the Penal Code definition, and the broader Family Code definition of domestic violence. (See, e.g., *Ogle*, *supra*, 185 Cal.App.4th at p. 1144 [Family Code section 6211 "defines domestic violence more broadly" than Penal Code section 13700]; *People v. Caceres* (2019) 39 Cal.App.5th 917, 922 [even if crime of making criminal threats (Pen. Code, § 422) did not meet the definition of domestic violence under Penal Code section 13700, it met the "broader definition under Family Code section 6211"]; *People v. Kovacich* (2011) 201 Cal.App.4th 863, 893-895 [defendant kicking family dog qualifies as domestic violence admissible under Evidence Code section 1109 because it constitutes "abuse" under the broader definitions in Family Code §§ 6211, 6203, subd. (a)(4), and 6320, subd. (b)].)

We are not persuaded by Morales's contention that the Legislature intended to incorporate only the Family Code definition of domestic violence, but not the Family Code definition of abuse. Morales's contention ignores the plain language and overall structure of the statutes. Both Penal Code section 13700 and Family Code section 6211 define " '[d]omestic violence' " as "abuse" committed against specified categories of people, including spouses. (Pen. Code, § 13700, subd. (b); Fam. Code, § 6211, subd. (a).) The definition of "abuse" is found elsewhere, however. Under the Penal Code, abuse is defined in subdivision (a) of Penal Code section 13700. Under the Family Code, abuse is defined in Family Code section 6203 for purposes of Family Code section 6211. We therefore reject Morales's contention that the only definition of abuse applicable for purposes of Evidence Code section 1109 is the definition found in Penal Code section 13700. As relevant here,

19

propensity evidence was admissible under Evidence Code section 1109—and it was appropriate to refer to the protective order violations in the corresponding jury instruction—because: Evidence Code section 1109 defines a prosecution "involving domestic violence" by reference to the Family Code (see Evid. Code, § 1109, subds. (a) & (d)); Family Code section 6211 defines domestic violence as abuse against a spouse or former spouse (Fam. Code, § 6211, subd. (a)); Family Code section 6203 defines abuse as including, inter alia, any behavior that has been or could be enjoined pursuant to Family Code section 6320 (Fam. Code, § 6203, subd. (a)(4)); and Family Code section 6320, in turn, provides that the court may enjoin a party from "contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party" (Fam. Code, § 6320, subd. (a)); see *Ogle*, *supra*, 185 Cal.App.4th at p. 1144 ["Family Code section 6211 defines domestic violence to require abuse and Family Code section 6203, subdivision (d) defines 'abuse' to include 'engag[ing] in any behavior that has been or could be enjoined pursuant to [Family Code s]ection 6320.' "].) Failing to read the entire statutory scheme as a whole, as Morales proposes, would undermine the plain language of the statute and ignore the broad statutory definition of domestic violence under the Family Code. (*Ogle*, at p. 1144 [rejecting argument that "the Family Code reference in [Evidence Code] section 1109's definition of domestic violence . . . was not really intended to incorporate all forms of abuse that fall within the broader Family Code definition"]; *Mani*, *supra*, 69 Cal.App.5th at p. 819 ["Section 1109 clearly and unambiguously incorporates the Family Code definitions of domestic violence and abuse"].)

Even if we were to assume error, we would conclude Morales was not prejudiced. (See *People v. Megown* (2018) 28 Cal.App.5th 157, 167 ["Under

20

the *Watson* test, the trial court's judgment may be overturned on appeal only if the defendant shows 'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.' "].)[12]

The evidence against Morales was strong. Jessica's accounts regarding the assault incident, made initially to the police and recounted at trial, were detailed, consistent, and compelling. Her claims of prior abuse were corroborated by the photographs she took and preserved, and law enforcement captured a photograph of the bruise on her arm sustained in the charged assault, further corroborating her account. Meanwhile, Morales's self-serving trial testimony that he was not angry at Jessica was undermined by his prior statements to police (for example, his statement that Jessica was "that chick" who "just fucked [his] life over" and she was with another guy like a "fucking dirty, like, fucking bitch") and by the text messages he sent Jessica calling her a "selfish piece of shit," "bitch," "pendeja," "whore," "[s]nitch," and "fucking bitch piece of shit." Similarly, his testimony that the gun was not his was undermined by the DNA evidence linking him to the gun and by the seizure from his home of the magazine that fit the gun.

---

[12] Morales claims the heightened *Chapman* standard should apply, such that we should assess whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. (*Chapman v. California* (1967) 386 U.S. 18, 24.) But this standard applies when an instruction misstates the law on an element of an offense (see *People v. Hudson* (2006) 38 Cal.4th 1002, 1013), which Morales does not contend here, and Morales has not established that any claimed error amounts to a violation of his constitutional rights. (*Bryant, Smith & Wheeler, supra,* 60 Cal.4th at p. 413, fn. 34 ["every state law error does not automatically result in a violation of the federal Constitution"]; *People v. Jandres* (2014) 226 Cal.App.4th 340, 359 [rejecting defendant's claim that instructional error regarding sexual offense propensity evidence amounted to constitutional error warranting assessment under the *Chapman* standard].)

The other acts of domestic violence, both charged and uncharged, were unquestionably admissible to prove propensity under section 1109 because they involved actual or attempted bodily injury or threats of harm.[13] (See *Ogle, supra*, 185 Cal.App.4th at p. 1145.) The text messages themselves were independently admissible for the purpose of establishing guilt on the contempt counts. Moreover, the text messages were "not so highly inflammatory or emotionally charged as to prevent a fair trial." (*Ibid*.) Indeed, this evidence was relatively mild compared with the other evidence of domestic violence that Morales does not dispute was properly introduced for propensity.

Morales claims the propensity instructions allowed the jury to avoid fundamental questions of credibility. We disagree. The jury had the opportunity to hear testimony at trial both from Jessica and from Morales, and thus had the opportunity to directly assess their respective credibility. Moreover, the jury was properly instructed on the elements of the offenses, the burden of proof, and assessing the credibility of witnesses. With respect to the instruction regarding charged domestic violence, the jury was properly instructed to consider the charged offenses only if they were proved beyond a reasonable doubt. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475 [" ' " 'we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " ' "].)

_____

13    Morales does not contend the propensity instructions should not have been given at all, or that any evidence was erroneously admitted. Under his claim of error, the instruction regarding charged domestic violence was proper with respect to the charged counts of making a criminal threat, assault, and battery (counts 1-3). He claims the instruction should have been limited to direct the jury to consider only those three charged offenses, and not the additional contempt of court counts, as propensity evidence.

In sum, we conclude Morales has not established any instructional error, he was not prejudiced by the instructions given, and his substantial rights were not adversely affected.

DISPOSITION

The judgment is affirmed.


GUERRERO, J.

WE CONCUR:


HALLER, Acting P. J.


O'ROURKE, J.