Filed 11/13/24  P. v. Moton CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>AARON WENDELL MOTON,<br><br>    Defendant and Appellant. | F087062<br><br>(Super. Ct. No. F21909362)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kimberley A. Donohue and Craig S. Meyers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Aaron Wendell Moton was convicted by a jury of murder and assault on a child causing death in connection with the beating death of his girlfriend's two-year-old son.  He challenges the trial court's admission of prior acts of domestic violence

under Evidence Code section 1109.[1]  He first contends section 1109 violates due process. In the alternative, he argues the trial court abused its discretion by not excluding the prior acts evidence under section 352.  We affirm.

## STATEMENT OF THE CASE

The Fresno County District Attorney charged Moton in a two-count information with murder (Pen. Code, § 187, subd. (a); count 1) and assault on a child causing death (Pen. Code, § 273ab, subd. (a); count 2).  A jury convicted him as charged.  The trial court sentenced him to 25 years to life on count 2 and stayed a term of 15 years to life on count 1.

## FACTS

**I.      Prosecution's case**

**A.      The crime**

In October 2021, Nikkey lived with her nearly three-year-old son, X., and her boyfriend, Moton, in an apartment in Fresno.  X. was born in October 2018, and died in October 2021.

Nikkey worked at Community Regional Medical Center.  Her shift began at 3:00 p.m. and ended at 11:30 p.m.  Moton regularly cared for X. while Nikkey worked, and also helped care for him even while Nikkey was home.  X. grew attached to Moton.

On October 4, 2021,[2] Moton drove Nikkey to work for her regular shift at 3:00 p.m., then took X. home.  Moton had recently started a new job, working the overnight shift from 10:00 p.m. to 7:00 a.m.  On days where Nikkey and Moton both worked, since Moton had to leave for work before Nikkey was off, Moton would usually watch X. from 3:00 p.m. until 9:30 p.m., then take him to the home of Nikkey's sister, Kelli, on his way to his job.  Kelli lived in the same apartment complex.

---

[1] Undesignated statutory references are to the Evidence Code.

[2] All references to dates are to dates in 2021 unless stated otherwise.

2.

On October 4, at about 11:45 p.m., Nikkey went to Kelli's apartment after work to get X. X. had misplaced one of his shoes at Kelli's, so Nikkey suggested she get the shoes the next day because it was so late. Nikkey carried X. home. At home, X. acted normally and seemed happy. X. indicated he was hungry, so Nikkey fixed him some noodles, and X. ate a normal amount. Nikkey and X. lied in her bed together while she was on her phone until about 2:00 a.m., then Nikkey laid X. down in his bed to sleep.

Moton returned home at 7:30 or 8:00 a.m. on October 5. Nikkey woke up and they smoked marijuana before they went back to bed together. Nikkey woke up at noon and went to check on X., who was lying awake in his bed. X. said he was hungry and got up and walked to the kitchen. Before placing him in the highchair, Nikkey laid X. down on the floor and changed his diaper, which was soiled with urine and a small amount of normal-consistency stool.

X. ate a typical amount of cereal and milk for breakfast while watching TV. Nikkey meanwhile got ready for her 3:00 p.m. work shift. Moton got up about 1:00 p.m. The plan for the day was that Moton and Nikkey would drop X. off at his paternal grandparents' home, where they were hosting an early birthday party for X., and then Moton would drive Nikkey to work.

While Nikkey got herself ready, Moton changed X.'s diaper and dressed him for the party with clothes Nikkey had laid out. Nikkey texted Kelli at 2:00 p.m. because she needed X.'s shoes. At about 2:15 p.m., Nikkey went out to the parking lot to meet Kelli to get the shoes. Kelli stayed in her car, and Nikkey and Kelli chatted for several minutes before Nikkey came back inside. Nikkey initially reported she was out of the apartment for a minute. In a later interview, Nikkey said she was outside for "about five minutes," and at trial she testified she was outside for eight to 10 minutes before going back inside. Kelli testified they talked in the parking lot for six or seven minutes.

Nikkey set X.'s shoes on the couch when she came back inside and continued getting ready for work. X. was on the couch watching TV, and she did not notice

3.

anything wrong with him, though she only glanced at him. She did not remember where Moton was when she came back inside, but he might have been in the bathroom.

Nikkey came out of her bedroom about 10 minutes later and found Moton holding X., with X.'s head resting on Moton's shoulder. Moton held X. out from his chest, and Nikkey saw X. was droopy and not holding himself up. Nikkey asked Moton why X. was like that, and Moton told her not to panic. X. was laid on the couch and Nikkey unsuccessfully tried to rouse him. X. did not talk, cry, or get up. He moaned slightly and was having trouble breathing.

Nikkey, in a panic, called Kelli for advice. She switched the call to a video call to show X. to Kelli. X. was lying on the couch, eyes closed, and looked pale. Kelli told Nikkey to call 911 and headed over to Nikkey's apartment.

Nikkey called 911, and the call was played for the jury. Nikkey said X. went from "just fine" 15 minutes ago to barely able to keep his eyes open, pale with white lips, moaning, and unresponsive with trouble breathing.

Moton carried X. out to meet the paramedics. Moton told paramedics he went to change X.'s diaper and X. suddenly became like this—half asleep, not quite talking. The paramedics asked if X. had suffered any trauma and Moton said no before walking away.

Nikkey rode in the ambulance with X. and Moton followed in a car. During the ride, Nikkey became defensive when she was asked about the number of bruises on X. in various stages of healing. But the paramedic who testified stated that he did not think Nikkey was trying to cover anything up. X. was in and out of focus during the ride, his breathing became erratic, and his blood pressure became unmeasurable. He seemed to be going into shock.

Moton texted Kelli from the hospital while Kelli was en route. One message he sent stated X. was fine when his diaper was changed. He texted that Nikkey brought the shoes in, and when he went to put the shoes on is when he noticed X. was breathing abnormally. Moton said it scared him and he thought X. just needed water until he

4.

picked X. up and noticed he was weak. Moton also texted that he was concerned X. may have hit his head on the bunk bed and corner of the wall.

X. arrived at the emergency room lethargic, difficult to wake, and moaning. He was pale with rapid heart rate and his hemoglobin was very low. A blood transfusion did not help. X. stopped moaning and his eyes remained closed.

Within a half hour, his heart rate slowed to the point of cardiac arrest. An ultrasound examination indicated severe abdominal bleeding between the kidney and liver. Despite extensive medical intervention, X. was pronounced dead a little over an hour after arriving at the hospital.

Moton was interviewed outside the hospital where family had gathered. He appeared sad. He said X. had diarrhea twice that day, and he changed X.'s diaper after the second time. As he helped X. get dressed, he noticed X. became "woozy." He laid X. down on the couch and went to the bathroom to brush his hair, and when he returned, he saw X. was "out of it." He gave X. "little puffs" of breath into X.'s mouth. Then he showed Nikkey that X. was "limp."

An autopsy conducted the next day, October 6, revealed several pattern bruises and external injuries in various stages of healing, raising suspicion of abuse based on the number, location, and pattern. Nikkey was aware of some of these bruises but denied knowing of others. Internally, X.'s liver was found to be completely severed into two pieces, something the pathologist had never seen in his 38-year career in a suspected child abuse case. It was an irreparable injury with rapid blood loss. X. also had a ruptured vertebrae. There was also trauma to his diaphragm and pancreas, and his stomach was displaced. The injury to the diaphragm would have made breathing very difficult. The confluence of injuries would have been "very painful." The pathologist determined the cause of death to be non-accidental blunt force trauma and liver laceration and the manner of death to be homicide. A fall from a bunk bed would not cause the type of injuries X. suffered.

5.

On October 6, Nikkey and Kelli went to the police station to be interviewed. Moton went too but stayed in the car. Kelli testified Moton attempted to deter the sisters from talking to detectives. After the sisters' interviews, the detectives went outside and asked Moton if they could speak to him. Moton initially declined but then agreed to be interviewed.

Moton told the two detectives that X. called him "dad." Moton woke up on October 5 at 1:00 p.m. and came out and saw X. in his highchair. That morning, Nikkey was "acting … cool" with no "attitude" and there were no issues between Moton and Nikkey. He did not notice anything unusual about X. They were getting X. ready for a party, and he was getting ready for an anger management meeting arising from a hit and run case. (Officers later determined the anger management classes were not related to a hit and run conviction, but a domestic battery conviction.) Moton said Nikkey had changed X.'s diaper the first time, and after X. was dressed, X. had another bowel movement. Moton changed the second diaper and found it contained dark, watery stool. X. cried a little during the second diaper change, a common reaction. Moton then sat X. on the couch to watch TV while Moton went into the bathroom to comb his hair and brush his teeth. When he went to the bathroom is when Nikkey went outside to meet Kelli to get X.'s shoes. Nikkey was outside for five to 10 minutes. There was no one else inside the apartment then except Moton and X.

When Moton came out of the bathroom and went to put X.'s shoes on, he saw X. flat on his back in the same spot on the couch, not moving, and his eyes closed. Moton picked X. up and found he was limp and nonresponsive. Moton stated that Nikkey was in the kitchen and on her phone at this point; she had come back inside the apartment "right after" he had finished using the restroom. He was first to notice something was wrong with X. X. was feeling woozy, but when Moton pushed on X.'s chest and breathed into his mouth, X. "popped his eyes open" and grabbed Moton tightly before becoming woozy again.

6.

When detectives told Moton X.'s internal injuries were severe and caused significant internal bleeding, Moton asked, "Where, his stomach?" Detectives had not yet mentioned a stomach injury. Moton said he could not understand how X. could have suffered something so severe because X. was not crying.

About halfway into the interview, Moton admitted he shook X. When Moton and the detectives started talking about the shaking, Moton started to lose his color and turned pale as if he was going to faint. He started sweating, became unintelligible, put his head on his arms, and started mumbling to himself. It took him a few minutes to regain his composure. Moton stated he shook X. three times "pretty hard" consecutively to try to revive him. He tried rescue breaths before switching to shaking him. He said he did not initially report the shaking because he was afraid it may have caused X.'s death. He said Nikkey would never hurt X. because that's her baby and also said he would never hurt him; he said, "I have him every day."

## B. Past instances of domestic violence

### 1. Nikkey

Moton would lose his temper and yell at Nikkey. He often got frustrated and would leave. He was controlling and would cuss at her and call her names. There were instances when he would push her during fights. He also got easily frustrated with X. and was generally impatient with him. But Nikkey never saw Moton spank X. and said she "never thought that he would hurt [X.]"

In June 2021, Nikkey came home from a graduation party and she and Moton started arguing. They were in the bathroom and she was trying to leave, but he was preventing her from doing so. He took her phone and broke it. He pushed her against the wall and used his left hand to strangle her. Nikkey felt like she was going to pass out.

### 2. Diamond

As mentioned, during his October 6 interview with police, Moton told detectives that on the day of X.'s death he was preparing to attend an anger management class.

7.

When they asked him what the class was for, Moton she it was from a "little hit and run" that happened two years ago. In fact, Moton had been convicted of domestic battery of his ex-girlfriend, Diamond, in October 2020 and was required to attend a 52-week domestic batterer's treatment program.

### 3. Mia

In October 2021, detectives interviewed another of Moton's ex-girlfriends, Mia, who was the mother of Moton's child.[3] Mia and Moton met in October 2019, and their son was born in August 2020. She had seen an angry side of Moton. He would get "very pumped and riled up" and then walk away angry. He cussed and would get abusive and angry. He lost his temper with her before.

Once, Mia and Moton were arguing and she wanted to remove her son away from it. Moton grabbed their four-month-old son and pushed her into a window, causing a bruise on her back. He came back after some time and apologized.

Another time, Moton was driving "crazy" with Mia and their son in the car. After she repeatedly asked him to not drive so erratically with their baby in the car, he smacked her in the face. However, Mia also stated Moton was very patient with her and their son as well as with Mia's nieces and nephews. He would make her nieces and nephews laugh.

## II. Defense case

Moton testified in his own defense. He never bruised or spanked X. He disciplined X. by giving him a timeout by placing him on the couch. He admitted grabbing Nikkey by the neck in the bathroom incident and admitted he "had some violence towards Mia."

He does not know how X. got hurt; he did not beat him or hurt him. Nikkey went outside to get X.'s shoes from Kelli while he changed X.'s diaper. He had changed X.'s

---

[3] The parties stipulated to playing a recording of that interview.

diaper over a hundred times. X. was fussy during the change but did not cry. He put X. on the couch to watch TV and changed the channel for him after X. asked. He then went into the bathroom to use the toilet, brush his teeth, and comb his hair.

He heard Nikkey came back inside and he went to go put X.'s shoes on, which were next to the couch. He put the shoes on and X. was limp and out of it with his eyes closed. X.'s head went back when Moton picked him up. Nikkey came into the living room and asked what was wrong and he said he did not know.

When Moton shook X., his body was loose but his neck was straight and strong. After shaking him, X.'s eyes popped open and he hugged Moton tightly around the neck. Moton thought X. would be fine after that. Nikkey was next to him while he shook X., and she told him not to do that. He did not mention the shaking before his interview with detectives because he was afraid that might have killed him.

## DISCUSSION

The trial court granted the prosecution's pretrial motion in limine seeking permission to introduce evidence of Moton's commission of other acts of domestic violence under section 1109. Moton first argues that section 1109 violates his right to due process because it permits evidence of other acts of domestic violence to be used as propensity evidence. Second, he argues the trial court abused its discretion in not excluding evidence of the prior acts under section 352. We disagree with both claims.

## I.     Relevant background

The prosecutor moved in limine to present evidence under section 1109 of three prior instances of domestic violence committed by Moton, which the court granted. The first proffered instance involved Mia, where Moton removed their son from her arms and pushed her into a window. The prosecutor stated this instance was the basis of Moton's domestic violence conviction and required batterer's treatment program, and the prosecutor sought to introduce evidence of the conviction and the fact that he was required to participate in the program. The prosecutor was mistaken that this incident

9.

was the basis of the conviction. As explained, the conviction stemmed from an unspecified act of domestic violence against another former girlfriend, Diamond. Apparently, neither the prosecutor, defense counsel, nor the court recognized this mistake at any point in the trial.

The second and third instances of domestic violence the prosecutor sought to introduce involved violence against Nikkey. The second occurred in June 2021 and involved Moton pushing her into a wall and strangling her and also breaking her phone. This incident was presented at trial. The third happened in July 2021 at Moton's sister's birthday party. Moton and Nikkey got into an argument and Moton pushed and shoved Nikkey and broke some items.

Moton objected to all of the prior acts evidence, arguing it would "inflame the jury," stir up hatred for him, and cause an undue consumption of time. His counsel asserted the prior acts were not similar to the current offense in that (1) the prior acts "involved alcohol" and "accusations of cheating" and (2) the victims in the prior acts were adults and the victim here was a child. Counsel also argued it would be unfair for the jury to be allowed to conclude Moton has a propensity to "kill babies" from the fact that he has "some issues with some women."

The court ruled the prosecution could present evidence of all three proffered prior instances of domestic violence. The court found the three instances involved "similar flashes of anger or violence" demonstrating "an ongoing pattern of flashes where [Moton] apparently acts very quickly … in a rage or flash of anger" when he becomes jealous or angry. That compares to the current case, which involved "a very almost spontaneous act resulting … in [X.'s] death." The court ruled the evidence was relevant and highly probative because of the prior acts' similarity to the charged offense and their temporal proximity. The court acknowledged the evidence would be harmful to Moton but found it would not be unduly prejudicial. Relating to the risk of prejudice, the court stated the jury presumably would follow the "very specific instructions" regarding the

10.

purpose for which the prior acts evidence could be considered. The court also ruled the presentation of the evidence would not constitute an undue consumption of time.

## II.     Issue preservation

As detailed above, the prior acts evidence presented at trial deviated from the trial court's in limine ruling. No objection was lodged at any point during trial to the admission of any prior acts evidence.

The prosecution presented evidence during trial that Moton suffered a misdemeanor conviction for an act of domestic violence against *Diamond*, even though the prosecution stated during the pretrial hearing that the conviction related to violence against *Mia*. No facts of this crime were offered. Diamond was never mentioned during the pretrial motion proceedings. And the evidence presented at trial of the incident in which Moton slapped Mia in the face while driving was not mentioned in the pretrial proceedings.

In the section of his opening brief where he discusses whether the trial court erred in not excluding the prior acts evidence of section 352, he does not individually analyze any of the acts. He instead discusses them as a single body of evidence. But since none of the prior acts evidence was objected to during trial testimony, the only evidence eligible to be challenged is evidence encompassed by the in limine ruling. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 280–281 [issue asserting violation of in limine ruling forfeited by failing to object].) The admission of any evidence not encompassed by the pretrial ruling is forfeited for lack of objection.

Generally, an in limine ruling that evidence is admissible is insufficient to preserve a claim that the evidence should have been excluded. (*People v. Turntine* (2024) 104 Cal.App.5th Supp. 11, 15.) But " 'a sufficiently definite and express ruling on a motion in limine may … serve to preserve a claim.' " (*Id.* at p. 16.) "To be sufficient to preserve error for appeal a motion in limine must satisfy 'the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion

11.

is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context.' [Citation.] '[I]f a motion in limine does not satisfy each of these requirements, a proper objection satisfying Evidence Code section 353 must be made to preserve the evidentiary issue for appeal.' " (*Ibid.*)

In our view, the in limine ruling encompassed only three of the prior acts of domestic violence presented at trial: (1) the violence against Diamond resulting in a conviction and a required batterer's treatment program; (2) the incident where Mia was pushed into a window after Moton grabbed their son from her arms; and (3) the incident where Moton pushed Nikkey into a wall and strangled her. We recognize the first two acts were blended during the in limine proceedings in the sense that the trial court was led to believe the conviction stemmed from violence against Mia. Apparently, no one caught this mistake. In fairness, Moton's objection to all of the proffered evidence, and the trial court's ruling, should be construed as encompassing prior acts (1) and (2). But none of the other prior acts of violence admitted at trial were discussed in the in limine proceedings and thus cannot be said to be encompassed by the court's ruling. And since this other evidence was not objected to, its admission cannot be challenged on appeal. Therefore, our analysis only considers prior acts (1), (2), and (3).

## III.    Background law

Generally, "evidence of a person's character … is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) But if a defendant is charged with an offense involving domestic violence, "evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).) Section 352 vests the court with discretion to "exclude evidence if its probative value is

substantially outweighed by" the possibility of "undue consumption of time," "undue prejudice," confusion of the issues, or misleading the jury. (§ 352.)

"Undue prejudice," as used in section 352, does not mean evidence that is harmful to the defendant's case. " ' " '[T]he prejudice which exclusion of evidence under ... section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in ... section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " ' " (*People v. Fruits* (2016) 247 Cal.App.4th 188, 205 (*Fruits*).) In deciding whether propensity evidence is admissible under section 352, "trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission[.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) " ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' " (*People v. Thomas* (2021) 63 Cal.App.5th 612, 630.)

The trial court has broad discretion in making this determination, and the court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 480.) "In determining whether the trial court abused its discretion, we must focus on what the court was made aware of at the time it ruled on the motion, not on evidence that came out or

circumstances that took place during the trial." (*Fruits, supra,* 247 Cal.App.4th at p. 208.)

## IV.   Due process

Two decades ago, the Court of Appeal in *People v. Fitch* (1997) 55 Cal.App.4th 172 rejected a due process challenge to section 1108, a parallel provision to section 1109 which applies to sexual assault cases.[4] (*Fitch*, at pp. 184–185.)  The California Supreme Court subsequently agreed and, relying in part on *Fitch*, upheld the statute against a due process challenge.  (*Falsetta, supra,* 21 Cal.4th at pp. 917–918, 922.)  The high court stated, "To prevail on such a constitutional claim, [the] defendant must carry a heavy burden.  The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity.  [Citations.]  In the due process context, [the] defendant must show that section 1108 offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  [Citations.]  The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair."  (*Id.* at pp. 912–913.)  The court concluded that because trial courts have discretion to exclude propensity evidence under section 352, section 1108 does not violate the due process clause.  (*Falsetta,* at p. 917.)

Post-*Falsetta*, many Courts of Appeal have upheld section 1109 against due process challenges.  (*People v. Mani* (2022) 74 Cal.App.5th 343, 373, 376; *People v. Johnson* (2010) 185 Cal.App.4th 520, 529 & cases cited therein (*Johnson*).)  In *Johnson*, the Court of Appeal observed that "[t]he courts of appeal … have uniformly followed the reasoning of *Falsetta* in holding section 1109 does not offend due process" and it rejected

---

**4** Section 1108, subdivision (a) provides:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

14.

the defendant's due process challenge "as having already been settled unfavorably to him." (*Johnson, supra,* 185 Cal.App.4th at p. 529.) We concur. Section 352 protects a defendant's right to a fair trial and due process requires no more. (See *Falsetta, supra,* 21 Cal.4th at p. 917; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703–704.) Moton fails to persuade us to deviate from the long line of cases upholding section 1109.

## V.    Section 352

Moton also asserts the trial court abused its discretion by not excluding evidence of the prior acts of domestic violence under section 352. He argues the prior incidents were insufficiently similar to the circumstances of the charged offense to be probative. He also argues the potential for prejudice was high.

We conclude it was not arbitrary, capricious, or patently absurd for the trial court to admit the evidence of the prior acts. Contrary to Moton's assertion, the prior acts were similar enough to be probative. Moton emphasizes that the prior acts all involved violence against adult girlfriends, and not against children. But as the trial court observed, the prior instances and the current offense all appeared to involve sudden acts of rage. In the incident where Moton and Mia were arguing at home, Moton suddenly pushed her against a window. In the bathroom incident with Nikkey, she and Moton were arguing when Moton suddenly grabbed her neck and began strangling her. The facts of the underlying conviction involving Diamond were not offered at trial. In the current offense, by all accounts (including Moton's), Moton, Nikkey, and X. were having a normal day with no one in a bad mood when Moton suddenly and violently assaulted X. without any apparent provocation. The prior acts illustrated Moton's history of sudden violence against his ex-girlfriends, Mia and Nikkey, both of whom he lived with when he committed the violence. Moton also lived with X., the son of his then-girlfriend, at the time of the current offense and was close with him. What Mia, Nikkey, and X. each had in common is that they lived with Moton and were in a close relationship of some form with him when he assaulted them. The court did not abuse its discretion in finding that

15.

the prior acts and current offense were similar enough to give the prior acts probative value.

Further, any prejudicial impact from the evidence of the prior acts naturally flowed from their probative value. Though harmful to Moton's case, the evidence did not uniquely tend to evoke more of an emotional bias against him than the current offense. Indeed, the assault here was far more severe. The prior acts involved pushing and strangulation, and neither Mia nor Nikkey required medical attention. In contrast, the current offense involved a severe, fatal assault causing a completely severed liver, displaced organs, broken ribs, and a fractured spine. We thus conclude the trial court did not abuse its discretion in admitting the prior acts evidence.

**DISPOSITION**

The judgment is affirmed.


SNAUFFER, J.

WE CONCUR:


DETJEN, Acting P. J.


SMITH, J.

16.