Filed 3/12/25  P. v. Ackles CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082151 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN412537) |
| CALVIN LAMAR ACKLES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County. Michael D. Washington, Judge.  Affirmed.

Elizabeth Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Calvin Lamar Ackles of first degree murder for shooting and killing Francisco Cruz.  Ackles contends the trial court erred

when it admitted extensive testimony and other evidence about two assaults he committed many years before he killed Cruz. We agree the court abused its discretion with the admission of this evidence, but we conclude the error was harmless. At the request of the Attorney General, we have reviewed a security video that recorded the homicide. With chilling clarity, consistent with witness testimony, the video shows Ackles shooting Cruz nine times in the back at point blank range as he tries to get away. We are certain beyond a reasonable doubt the erroneously admitted evidence did not affect the jury verdict of first degree murder in this case. The judgment is affirmed.

PROCEDURAL AND FACTUAL BACKGROUND

I.

*Charges, Conviction, and Sentence*

In January 2021, Ackles was charged with first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). The operative information alleged as to count 1 that Ackles intentionally and personally discharged a firearm causing great bodily injury and death to a nonaccomplice. (§12022.53, subd. (d).) It further alleged he had two serious felony priors (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and two prior strike convictions (§§ 667, subds. (b)–(i), 668, 1170.12).

In January 2023, Ackles admitted the truth of his prior convictions. In February 2023, a jury convicted him of first degree murder and unlawful possession of a firearm and found true the enhancement allegation that he personally discharged a firearm.

At sentencing, the trial court struck the serious felony priors and prior strike convictions in the interests of justice. The court sentenced Ackles to 50

---

[1]     Undesignated statutory references are to the Penal Code.

2

years to life in prison, consisting of 25 years to life for the first degree murder and 25 years to life for the firearm enhancement. Pursuant to section 654, the court stayed the sentence for unlawful possession of a firearm.

II.

*The Prosecution's Case*

On the night of March 26, 2020, Ackles was working at an unlicensed marijuana dispensary with three other security guards. The illegal dispensary operated out of a warehouse in Vista, California. The warehouse was located at the top of a hill about 80 feet from a strip mall parking lot where customers were not supposed to park while purchasing marijuana at the dispensary. Sometimes, to make extra cash, the security guards would bring their own marijuana and sell it to the dispensary's customers in the parking lot outside the dispensary.

At approximately 9:30 p.m., Julian B. drove to the warehouse with his cousin Deshawn E. to buy some marijuana. Julian also worked for the marijuana dispensary as a security guard, but he was off duty that night. Julian went inside the warehouse and "got some weed" from Ackles while Deshawn remained in his truck. Julian then returned to his car and started driving away.

As Julian reached the bottom of the hill, near the strip mall parking lot, Ackles flagged him down. Julian stopped and Ackles asked him if he had any marijuana to sell. Julian and Deshawn could both see another man, later identified as Cruz, standing in front of his car in the strip mall parking lot. His car was a convertible and the top was down.

Julian told Ackles he had no marijuana to sell. Ackles then told Cruz "[t]he weed shop is closed and we can't get it for you." Cruz did not believe the dispensary was closed, and he and Ackles started arguing. Ackles told

3

Cruz to leave and Cruz refused, saying that they "don't own the parking lot." Ackles told Julian and Deshawn to get out of their car. They got out and the three men started walking toward Cruz's car. According to Julian, Cruz "smirked," got into his car, stayed there for about five seconds, and then "popped his trunk." Deshawn became concerned for his safety when Cruz opened the trunk, fearing he might be getting a weapon.

A surveillance video from a nearby market captured what happened next. Ackles slowly approached Cruz with one of his hands visibly holding something in his jacket pocket. Julian and Deshawn followed him and began walking toward Cruz as well.

As the three men approached, Cruz got out of his car, walked around to the trunk, and opened it. Ackles continued walking toward Cruz, reached the area of the car near the trunk, paused, and pulled a handgun out of his pocket. As Cruz began to pull a metal object, later determined to be a steering wheel lock, from the trunk, Ackles, now only a few feet from Cruz, suddenly pointed the gun directly at Cruz's face. Cruz, seeing the gun, began backing up.

The video shows Ackles then fired the gun at point blank range towards Cruz. Cruz ducked and hunched his body away from where the gun had been fired. Cruz then turned his back to Ackles and began to try to run. At this point, Ackles quickly stepped forward and shot Cruz in the back multiple times from less than a foot away until Cruz collapsed and fell to the ground. Ackles then stepped over Cruz's body, stared at it briefly, and calmly walked away.

Julian and Deshawn were about ten feet away when the shooting happened, but they did not have a clear view of the back of Cruz's car where the shooting took place. Neither one heard Cruz threaten Ackles in any way

beforehand, and they did not see Cruz with any weapons. According to Julian, Cruz did not appear angry or upset, "just kind of confused on why he had to leave."

As soon as the shooting started, Julian and Deshawn ran away, back up the hill toward the dispensary. Julian hid in a shed for about 10 seconds. After the shooting stopped, he and the other security guards gathered in the parking lot to find out what happened. As they stood there, Ackles walked up to them and said something along the lines of "I just killed him and I don't give a fuck." Julian ran back to his car, found Deshawn, and drove away.

A private security guard happened to be driving by and arrived at the scene within minutes. Within a short time, Sheriff's deputies arrived. Cruz was lying face down next to his car with his keys and a steering wheel lock on the ground next to him. There was blood everywhere. He had several gunshot wounds and was lying in a pool of blood. He had no pulse and was dead at the scene.

Deputies found 10 shell casings on the ground. A forensic medical examiner determined Cruz had been shot in the back nine times. He likely died within minutes from his injuries.

The parties stipulated that Ackles had two prior convictions for assault with a deadly weapon in violation of section 245, subdivision (a)(1), one in 2005 and one in 2013. Over Ackles's objection, the trial court judge allowed testimony about both incidents on the ground they were not unduly prejudicial and involved "sneak attacks" that were sufficiently similar to the charged offense to be probative of identity.[2]

---

[2] Ackles's actions in the uncharged incidents are more accurately described as *sudden attacks*. According to the testimony, both victims were aware of his presence, but were taken by surprise by the sudden escalation of violence.

5

Three witnesses testified about the 2005 incident. According to Hiep P. and Tong N., in January 2005, they saw Ackles get into a verbal altercation with another male customer while they were getting fried chicken at the Crispy Fried Chicken restaurant. Ackles and the other customer went outside and continued arguing, saying, "Do you know who I am?" back and forth to each other. The other customer did not appear to have a weapon. Suddenly, Ackles pulled out a hammer from his jacket, hit the other customer on his head, and said, " 'I'm a gangster.' " Ackles hit the other customer from the front, not from behind, and the other customer fell to the floor.

An investigator from the San Diego District Attorney's office showed the jury photographs of the victim's injuries. The hammer blow fractured his skull and he went to the hospital.

Two witnesses testified about the 2013 incident. According to Ruben O., he was working as a security officer in an apartment building in downtown San Diego in August 2013. He saw Ackles smoking marijuana in the courtyard, and told him to stop. Ruben started to walk away, but he saw Ackles enter the building's "day room," where he started to speak with the person who had complained about him in a way that seemed "harassing" Ruben confronted Ackles and Ackles "sucker punched" him in the face. They ended up in a "brawl," exchanging punches "back and forth." Ruben picked up a chair to defend himself and swung it at Ackles. Ackles then grabbed a chair, hit Ruben over the head with it, and walked out of the building.

David J. witnessed the first part of the encounter between Ackles and Ruben. According to David, Ruben got very close to Ackles when he spoke to him and "was talking to him . . . in a very unprofessional manner." But he confirmed that Ruben "was brutally attacked for no real logical reason," and that Ackles hit him suddenly in the face, with no warning at all, leaving it

6

"like a pool of blood." Ruben identified pictures of his injuries right after the attack, and the pictures were shown to the jury. Ackles broke Ruben's orbital bone and a dental plate that he had had installed.

## II.
### *The Defense Case*

Ackles did not testify or present any evidence. During closing argument, he conceded guilt on the felon in possession count and did not contest he was the person seen shooting Cruz on the security video. He disputed only the murder charge, claiming he acted in self-defense or imperfect self-defense. In the alternative, he argued he could not be convicted of first degree murder, because there was no evidence he committed the shooting with premeditation and deliberation.

## DISCUSSION

Ackles contends the trial court committed prejudicial evidentiary error by admitting evidence of the two uncharged prior offenses. He contends the evidence should have been excluded under Evidence Code sections 1101 and 352, because it was impermissible propensity evidence, and its probative value was outweighed by its highly prejudicial nature. He further claims the error violated his right to due process and a fair trial under the United States and California Constitutions.

Our review is for abuse of discretion. (*People v. Spector* (2011) 194 Cal.App.4th 1373.) We view the evidence in the light most favorable to the trial court's ruling. (*People v. Kipp* (1998) 18 Cal.4th 349, 370.) We conclude the court erred when it admitted evidence of the earlier offenses pursuant to Evidence Code section 1101, subdivision (b), because the evidence was not probative of a material fact other than propensity. But we conclude the error was harmless beyond a reasonable doubt.

A.	*The Trial Court Erred When It Admitted the Other Crimes Evidence*

Subject to certain exceptions, "[e]vidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) "Evidence of other crimes is admissible only if relevant to prove a material fact at issue, separate from criminal propensity." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 14.) "The trial court has the discretion to admit evidence of crimes committed by a defendant other than the one for which he is charged, if such evidence is relevant to prove some fact at issue, and if the probative value of the evidence outweighs its prejudicial effect." (*People v. Hawkins* (1995) 10 Cal.4th 920, 951, disapproved on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101.) By way of example, such evidence is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. (Evid. Code, § 1101, subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 402–403 (*Ewoldt*).)

"When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant." (*People v. Daniels* (1991) 52 Cal.3d 815, 856.) "As long as there is a direct relationship between the prior offense and an element of the charged offense, introduction of that evidence is proper." (*Id.* at p. 857.) However, because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." (*People v. Thompson* (1980) 27 Cal.3d 303, 314, 316.)

8

Here, the People contend the evidence of the 2005 and 2013 assaults was admissible to prove motive.[3]  They argue, "the jury here could . . . permissibly infer that [Ackles] similarly lost control during his verbal altercation with Cruz like he did with the prior assault victims and thus had the same motive in this incident as he had during those assaults—that is to violently assault those who challenge or disrespect him when they least expect it."  While we agree this is a reasonable inference, it is a prohibited one because it is just a roundabout way of saying the jury could infer that Ackles had a propensity to engage in sudden violence when he felt disrespected.  (Evid. Code, § 1101, subd. (a).)  And, in fact, propensity is exactly what the prosecutor argued to the jury with this evidence during closing argument:  "This is what he does when he is confronted in a verbal altercation.  This is what he does when he is told 'no.'  This is what he does

_____

[3]   As noted, the trial court ruled the evidence was admissible and relevant on the question of identity.  On appeal, the Attorney General does not argue in support of this theory of admissibility.  He asks us to uphold the court's ruling on alternate grounds.  (*People v. Fruits* (2016) 247 Cal.App.4th 188, 205 [reviewing court may "affirm the trial court's evidentiary ruling if it is correct on any theory of law applicable to the case, even if for reasons different than those expressly stated by the trial court"].)

We agree with the Attorney General's de facto concession that the prior assaults were not sufficiently similar to be probative of identity.  "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity."  (*Ewoldt, supra,* 7 Cal.4th at p. 403.)  "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature," to the point of virtually eliminating the possibility that anyone other than the defendant committed the charged offense.  (*Ibid.*)  Here, there is nothing about either of the two uncharged offenses that even approaches the makings of a distinctive signature sufficient to be probative of identity.  Regardless, and in any event, Ackles conceded the element of identity during closing argument, thus rendering any error on this particular point harmless under any standard.  (*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).)

when he feels he is being disrespected.  He assaults people.  He assaults them physically and with weapons, whether it is a hammer, whether it is sucker punching, whether it is a chair, or whether it is a gun down by his side.  He sneak attacks people when they turn away from him in a verbal altercation." Evidence Code section 1101, subdivision (a) precisely guards against admitting prior crimes evidence for this purpose.

In the alternative, the People contend the evidence was admissible to demonstrate Ackles's state of mind at the time of the shooting.  Specifically, the People's theory for admissibility is "the nature and degree of similarities between the prior assaults and the [charged] murder made the uncharged crimes highly probative of [Ackles's] intent in this case."  We are not persuaded.  To be admissible to prove intent, uncharged crimes need only be "sufficiently similar" to the charged offense so as to support the inference the defendant "probably harbored the same intent in each instance."  (*Ewoldt, supra,* 7 Cal.4th at p. 402 (cleaned up).)  Although this is a relatively easy standard to fulfill, the People fail to meet it here.

The People contend the incidents all share several common features. Those common features are (1) the victims in all three crimes were "male strangers" who had become involved in a verbal altercation with Ackles in a public setting, and (2) Ackles was observed to suddenly escalate the altercation to a violent physical encounter without warning.  We do not agree these asserted similarities have probative value, beyond propensity, with respect to the elements of murder.

To prove Ackles guilty of first degree murder, the People were required to prove the killing was "willful, deliberate, and premeditated."  (§ 189.)  In addition, because Ackles asserted he had an honest belief that he needed to defend himself, the prosecution was required to prove he did not act in

10

reasonable or unreasonable self-defense. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

Here, the asserted similarities between the charged and uncharged incidents—male strangers arguing in public and a sudden, unexpected escalation to physical violence—are generic and entirely commonplace features of assault offenses. Aside from pure propensity to commit violent acts, it is not a reasonable inference from these similar aspects of the prior assaults that Ackles harbored a premeditated and deliberated intent to kill Cruz, or even malice aforethought sufficient to support second degree murder. There is nothing distinctive about escalating a verbal argument to physical violence. There is also nothing remarkable about doing so without giving the other person a chance to respond. Beyond propensity, these aspects of the prior assaults do not have probative value on the question of whether Ackles intended to kill Cruz, and if so, whether he premeditated and deliberated before doing so.

Nor are the circumstances of the prior assaults probative of Ackles's state of mind with respect to self-defense. On this question, the circumstances underlying the prior uncharged acts were actually *dissimilar* to the circumstances in the instant case. Neither victim was observed to have a weapon or reach for a weapon before Ackles attacked. And, during the 2013 incident, Ackles hit Ruben with a chair after the two engaged in a fist fight and Ruben swung a chair at him, not suddenly with no prior physical interaction as was the case with the shooting here. The evidence thus had no tendency, beyond propensity, to prove whether or not Ackles harbored a good faith belief in the need for self-defense when he shot and killed Cruz.

11

The trial court accordingly erred when it admitted evidence of the two prior uncharged offenses. The evidence was inadmissible pursuant to Evidence Code section 1101, subsection (a).

B.    *The Error Was Harmless Beyond a Reasonable Doubt*

Ackles argues the *Chapman* standard applies to the assessment of prejudice, because the admission of the evidence was unduly prejudicial in violation of Evidence Code section 352 and fundamentally unfair under federal law as a consequence. (*People v. Partida* (2005) 37 Cal.4th 428, 435.) We do not reach this question because we hold the error was harmless under any standard for assessing prejudice. (*Chapman, supra,* 386 U.S. 18; *Watson, supra,* 46 Cal.2d 818.)

This was not a close case. The evidence that Ackles premeditated and deliberated before he killed Cruz and did so with no good faith belief in a need for self-defense was not only overwhelming, it came in the form of neutral documentary evidence—a third party's surveillance video—that squarely captured the brutal killing in a well-lit parking lot.

The video shows Cruz in a convertible with its top down late at night. He does not appear aggressive and does not appear to be armed. Ackles approaches him with his hand visibly holding something (the handgun) in his pocket and with Julian and Deshawn close behind. Cruz sees the men approach and walks to his trunk. Ackles is perhaps a dozen feet away, but he continues to approach Cruz with his hand still on the handgun until he is right behind Cruz, near the trunk. At this point, he removes the handgun from his pocket, pauses, and then shoots at Cruz as he is removing the steering lock. As Cruz turns and tries to run away, Ackles steps forward and shoots him multiple times in the back.

12

Based on this evidence alone, we are certain jurors could have no reasonable doubt that Ackles premeditated and deliberated the decision to kill Cruz, and that the addition of the evidence of the prior assaults was superfluous to the prosecution's case on this point. Whether to kill Cruz is manifestly what Ackles must have been thinking about as he slowly walked toward Cruz with his hand on the handgun and when he paused before shooting him. "Premeditated" means "considered beforehand." (*People v. Memro* (1995) 11 Cal.4th 786, 863 (cleaned up).) "Deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." (*Id.* at pp. 862–863 (cleaned up).) The evidence Ackles was thinking about whether to kill Cruz as he walked toward him was virtually unequivocal.

The evidence Ackles did not act in self-defense, whether reasonably or unreasonably, was also an open-and-shut case. The video shows Cruz initially standing alone without a weapon by his convertible. It shows him pop open the trunk and walk to get the steering wheel lock only after Ackles appears in the camera's view, with his hand in his pocket visibly holding something, and with Julian and Deshawn following him. Cruz backed away from Ackles when he first saw the gun. He was then shot in the back as he tried to run away. The defenses of self-defense and imperfect self-defense are not available to a person "who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense." (*People v. Enraca* (2012) 53 Cal.4th 735, 761.) The video makes it clear that Ackles was not in any danger from Cruz that was not of Ackles's own making.

This evidence—all captured on video—is more than enough for us to be certain the admission of evidence of the prior uncharged conduct was harmless. It is nevertheless worth pointing out that we also have Ackles's

13

statement to the other security guards about his state of mind after the murder: "I just killed him and I don't give a fuck." The prosecution's case here was airtight. We have no doubt "the error complained of did not contribute to the verdict obtained." (*Chapman, supra,* 386 U.S. at p. 24.)

DISPOSITION

The judgment is affirmed.

DO, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.